UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANSELMO ESPITIA, ANSELMO ESPITIA as Parent and Joint Custodian of M.E., a minor child, ANSELMO ESPITIA, as Parent and Joint Custodian of J.E., a minor child, NINFA ESPITIA, and BREANNA ESPITIA | § § § § § § | CIVIL ACTION NO. |
| **Plaintiffs** | § § § | |
| VS. | § § | |
| ISLAMIC REPUBLIC OF IRAN | § § | |
| **Defendant** | § | |

## <u>ORIGINAL COMPLAINT</u>

**TO THE HONORABLE COURT:**

**COMES NOW**, ANSELMO ESPITIA, ANSELMO ESPITIA as Parent and Joint Custodian of M.E., a minor child, ANSELMO ESPITIA, as Parent and Joint Custodian of J.E., a minor child, NINFA ESPITIA as the mother of ANSELMO ESPITIA, and BREANNA ESPITIA as the Daughter of ANSELMO ESPITIA.

Plaintiffs file this Complaint for multiple causes of action against Defendant the ISLAMIC REPUBLIC OF IRAN (hereinafter referred to as 'DEFENDANT'). PLAINTIFFS and would show this Court as follows:

## I. INTRODUCTION

This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the Antiterrorism Act, 18 U.S.C. § 2333, and supplemental causes of action,

1

seeking damages for personal injury and related torts, arising from multiple terrorist attacks and Improvised Explosive Device (IED) explosions incurred by Plaintiff ANCELMO ESPITIA on March 20, 2003 through June 2003 in the Sunni Triangle area of Iraq (location demarcated by Tikrit, Ramadi, Fallujah, and Baghdad) in which the Plaintiff was severely injured (the "Terrorist Attack"). These attacks were planned by al Qaeda terrorist Abu Musab Al-Zarqawi with material support, weapons, training, and funding from Defendant Islamic Republic of Iran.

## I. PARTIES

1.      Plaintiff Anselmo Espitia is currently a Texas resident and was a permanent resident of Texas at the time of the allegations giving rise to this cause of action. Plaintiff was a combat engineer and 62B construction equipment repairer, serving on active duty and attached to the 3rd Squadron, 7th Cavalry Regiment, 2nd Brigade Combat Team, Third Infantry Division. The 3rd Squadron was the 'Eyes and Ears' for the U.S. 3rd Infantry Division (Mechanized) and the 'Iron Fist' for the U.S. XVIII Airborne Corps. The Squadron was engaged with the enemy earlier and more often during the Iraq war than any other unit in modern warfare history.

Combat operations for Operation Iraqi Freedom began on March 20, 2003, when the squadron crossed into Iraq as the lead element of the 3rd Infantry Division. The Squadron attacked towards Baghdad fighting the Republican Guard, Sadam Fedayeen, and insurgents. With the capture of Baghdad, the division and the squadron transitioned to stabilization operations. By the time the Squadron had redeployed, it had eliminated 2,200 Iraqi soldiers, 64 tanks, 41 armored vehicles, numerous active air defense systems, as well as trucks and civilian vehicles used by suicide bombers.

Plaintiff was injured when he and his vehicle were hit by multiple Improvised Explosive Devices (IEDs) and Explosively Formed Projectile (EFP) blasts in March of 2003 to June of 2003 in the areas of Iraq. These IEDs and EFP shaped charges were built in Iran and designed to main, kill, murder, and destroy U.S. military personnel in their armored vehicles.

2.      Plaintiff M.E., is the minor child of Plaintiff Anselmo Espitia. M.E., is a resident of Texas. Plaintiff Anselmo Espitia is the child's joint managing custodian.

3.      Plaintiff J.E., is the minor child of Plaintiff Anselmo Espitia. J.E., is a resident of Texas. Plaintiff Anselmo Espitia is the child's joint managing custodian.

4.      Plaintiff Ninfa Espitia is Anselmo Espitia's natural mother.

5.      Plaintiff Breanna Espitia is Anselmo Espitia's natural daughter.

6.      Defendant the Islamic Republic of Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603 and designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of acts of extrajudicial killing and overseas attacks on Americans, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the Plaintiffs.

## II. JURISDICITION AND VENUE

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331 and 1605A, and 18 U.S.C. §§ 2333 and 2338.

8.      This Court has personal jurisdiction over defendant Iran pursuant to 28 U.S.C. § 1330(b).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3) and the rules of pendent venue.

10.     Defendant also availed itself to the jurisdiction of a Texas Federal court when in 2020, it was discovered that the Islamic Republic of Iran conspired with four Texas residents (situated in Texas) to bypass the official oil embargo on Iran and sell Iranian oil to China via the use of shell companies. The Texas residents were indicted in 2020 on charges of conspiracy and violating the International Emergency Economic Powers Act related to the economic sanctions against Iran.

The Texas residents were identified as: Daniel Ray Lane, 38; Robert Thwaites, 30; Nicholas James Fuchs, 26; and Zhenyu Wang, 39. The criminal complaint, *USA v. Hovan,* et al., 2:20-CR-254, Eastern District Pennsylvania, is attached as **Ex 1.**

## III. EXHAUSTION OF ADMINISTRATIVE PROCEDURES

11.     All other conditions precedent have been performed or have occurred.

## IV. JURY DEMAND

12.     Plaintiffs demand a jury trial on all issues so triable.

## V. STATUTE OF LIMITATIONS TOLLED

13.     Any applicable statute of limitations is tolled by the Defendant's omissions and fraudulent concealment. Texas recognizes the *fraudulent concealment doctrine* and requires that a plaintiff plead, and subsequently prove, that (1) defendant

4

had actual knowledge of the facts giving rise to plaintiff's cause of action, (2) defendant concealed its unlawful conduct, and (3) plaintiff failed, despite due diligence on his part, to discover the facts giving rise to his cause of action. *See Tex. v. Allen Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir. 1988); *see also Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984).

Thus, when a defendant controls the facts giving rise to a plaintiff's cause of action "such that a reasonable person could not obtain the information even with a diligent investigation, a cause of action accrues, but the statute of limitations is tolled." *Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir. 1995). To adequately plead allegations of *fraudulent concealment,* a plaintiff must plead sufficient facts to place the defendants on notice of the tolling theory on which the plaintiff's complaint rests. *Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.,* 1 F.3d 374, 376 (5th Cir. 1993); *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1425 (5th Cir. 1992).

14.     In the instant case, it was only recently discovered in 2020 that: a) Defendant was harboring al Qaeda leaders and fugitives in Iran (*see Section VI,* Item 39) and b) Defendant conspired with four Texas residents in 2020 to violate the embargo and sell Defendant's oil to China. *See Section II,* Items 6-7, supra.

## VI. STATEMENT OF THE CASE

15.      Since the 1979 Iranian Revolution, Iran has been ruled by a series of governments and dictators deeply hostile to the United States.

16.     Since 1984 until the present time, Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

17.     During all periods relevant to this suit, it has been the continuous and official policy of Iran to use terrorism against the United States and its allies, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Iran is able to enlist these terrorist proxies to carry out attacks against the United States, and advance Iranian interests around the world. Iran exploits its support for terrorist organizations to obtain leverage with other countries, either "punishing" them or obtaining concessions from them.

18.     Additionally, Iran utilizes its support of international terrorism to attempt to (a) intimidate and influence the United States government and public, and thereby to weaken, harm and undermine the United States militarily, economically and politically and (b) intimidate and influence the Iraqi government and public and thereby seeks to bring about the eventual eradication of the secular Republic of Iraq and replace it with an Islamic state, and (c) the murder and/or expulsion of U.S. servicemembers and U.S. government employees from the middle East.

19.     Towards these ends, Iran has provided massive material support and resources to numerous anti-American and anti-Iraq terrorist organizations, including al Qaeda, which shares Iran's violently anti-American ideology and goals.

**Iran's Support of al Qaeda in Iraq**

20.     During the period relevant hereto, Iran provided al Qaeda with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described in detail below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and attacks on Americans, including the Terrorist Attack. Such support was provided continuously, routinely and in furtherance and as implementation

of a specific policy and practice established and maintained by Iran, in order to assist al Qaeda achieve goals shared by Iran. These goals included terrorizing the American servicemembers in Iraq, destabilizing the Republic of Iraq, attacking the civilian population in Iraq, weakening Iraq's economy, social fabric, and military strength and preparedness, and harming Iraq's allies and supporters, especially the United States.

21.     Iran provided the material support and resources detailed below pursuant to an agreement reached between Iran and al Qaeda in the years prior to the Terrorist Attack, which remains in force until today. Under that agreement, al Qaeda undertook to carry out acts of extrajudicial killing and terrorism against U.S. Servicemembers in Iraq and elsewhere, and in return Iran undertook to provide al Qaeda with material support and resources to carry out such extrajudicial killings and terrorist attacks. The purpose of this agreement between Iran and al Qaeda was to achieve the goals detailed in the preceding paragraph and replace the government of Iraq with an Islamic dictatorship.

22.     Iran provided the material support and resources detailed below through its security and intelligence agencies. These security and intelligence agencies included primarily, but without limitation, Iran's Ministry of Intelligence and Security ("MOIS"), the Islamic Revolutionary Guard Corps ("IRGC"), and a subdivision of the IRGC known as the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF").

23.     Iran provided al Qaeda with the material support and resources detailed below through officials, employees, and agents of Iran who worked in or with MOIS, the IRGC and the IRGC-QF. These Iranian officials, employees, and agents included without limitation: Ali Fallahian, Saeed Emami, Mohsen Rezaee, and Ahmad Vahidi (collectively below: "Iranian Officials").

24.     In addition, at all times relevant hereto, Iran and the Iranian Officials provided al Qaeda with the material support and resources detailed below, by and through the agency of Iranian-supported terrorist groups and terrorist operatives (collectively below: "Iranian Agents"), which and who received material support and resources from Iran and Iranian Officials for the purpose of providing material support and resources to al Qaeda, and which acted as agents and proxies of Iran and Iranian Officials for that purpose. The Iranian Officials and the Iranian Agents are collectively referred to below as Iran's "Officials and Agents."

25.     The material support and resources that were provided to al Qaeda by Iran and its Officials and Agents in the years immediately prior to the Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to al Qaeda; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to al Qaeda; provision of military-grade explosives, military firearms and other weapons and matériel to al Qaeda; providing use of training bases and military facilities in which terrorist training was provided to al Qaeda and its operatives; providing al Qaeda and its leaders and operatives safe haven and refuge from capture; providing al Qaeda means of electronic communication; providing al Qaeda with financial services, including banking and wire transfer services; and providing al Qaeda means of transportation, including allowing leaders and operatives of al Qaeda passage on Iranian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

26.     Iran and its Officials and Agents gave substantial aid and assistance to al Qaeda, and provided the massive material support and resources described above to al Qaeda, and thereby aided and abetted al Qaeda, all with the specific intention of causing

and facilitating the commission of acts of extrajudicial killing and terrorism, including the Terrorist Attack. Iran and its Officials and Agents did so with actual knowledge that al Qaeda had killed and injured U.S. citizens in terrorist attacks and that additional U.S. citizens and other persons would be killed and injured as a result of their aiding, abetting, and provisioning of material support and resources to al Qaeda.

27.    Iran and its Officials and Agents knowingly and willingly conspired, agreed and acted in concert with al Qaeda, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including the Terrorist Attack. Iran and its Officials and Agents did so with actual knowledge that al Qaeda had killed and injured U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with al Qaeda.

28.    At all times relevant hereto, MOIS, IRGC and the IRGC-QF were agencies, instrumentalities and/or offices of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran and within the scope of their agency and office, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that MOIS, IRGC and the IRGC-QF implemented and acted as conduits and instrumentalities for Iran's provision of funds, terrorist training, and other material support and resources to al Qaeda for the commission of acts of attempted extrajudicial killing and terrorism including the Terrorist Attack.

29.    Iran authorized, ratified and approved the actions of MOIS, IRGC and the IRGC-QF described herein, and is therefore vicariously liable for those actions.

30.    At all relevant times, Iran's Officials and Agents were officials,

employees, and/or agents of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that Iran's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Iran to al Qaeda for the commission of acts of attempted extrajudicial killing and acts of terror including the Terrorist Attack.

31.     Iran authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore vicariously liable for those actions.

**Iran's Support for and Harboring of Abu Musab Al-Zarqawi**

32.     After the launch of Operation Enduring Freedom in October 2001 in response to the September 11 attacks, many members of al-Qaeda, including Osama bin Laden, fled to the lawless Federally Administered Tribal Areas of Western Pakistan. Key elements of al-Qaeda leadership also escaped to Iran, with Iranian authorities' assistance. In late 2001, for example, a senior al-Qaeda operative based in Iran, Mustafa Hamid, again negotiated with the Iranian government to relocate Al-Qaeda families to Iran.

33.     In 2003, The Washington Post reported on a "decade-old relationship" between Ayman al-Zawahiri, then Al-Qaeda's second-in-command, and Ahmad Vahidi, Iran's former Minister of Defense. In 2001, Vahidi reportedly provided "safe harbor for some Al-Qaeda leaders who were trapped in the mountains of Tora Bora" following negotiations with al-Zawahiri. According to a European intelligence analyst, "The [Iranian Quds] Force's senior leaders have longstanding ties to al-Qaeda, and since the

fall of Afghanistan, have provided al-Qaeda leaders with travel documents and safe haven.

34.     Under such arrangements, key members of al-Qaeda's operational structure came to reside in Iran, including such infamous figures as Saif al-Adel (Security Chief), Saad bin Laden (Osama's son, Senior Operative), Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri, CFO of al Qaeda) and Abu Musab al-Zarqawi (future Chief of al Qaeda in Iraq).

35.     Notionally, Iran held these al Qaeda operatives under "house arrest," but in reality, al Qaeda was using Iran as a base of operations under the protection of the Quds Force. One al Qaeda member noted that there were several stages of restrictions, but in the end, it was "not really house arrest but rather a hospitality." By providing al Qaeda operatives such sanctuary, Iran has been in direct violation of U.N. Security Council Resolution 1390, which prohibits the harboring of al Qaeda members.

36.     Abu Hafs Mauritani, a leading figure of al Qaeda who was in Iran for roughly a decade after 9/11, revealed that al Qaeda members agreed not to carry out attacks from within Iran in exchange for maintaining a safe haven there. Over the next decade, as a means to further its own regional goals, the Iranian regime would permit al Qaeda to use its territory to plan terrorist attacks abroad as well as transit money, arms, and fighters across the region.

37.     Since 2001, Iran has harbored key al Qaeda operatives. After the 9/11 attacks, al Qaeda's operational structure split into two groups – Iran and Pakistan. The first part of al Qaeda's main operational structure was sent to Iran. This group was led by the head of al Qaeda's Security Committee, Saif al-Adl, and the head of al Qaeda's

Training Sub-Section, Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri). The group also came to include Osama bin Laden's two sons Hamza and Saad bin Laden.

38.     In its 2010 "Country Reports on Terrorism," the U.S. State Department wrote that "Iran has repeatedly resisted numerous calls to transfer custody of its al Qaeda detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al Qaeda members who fled to Iran following the fall of the Taliban regime in Afghanistan."

39.     In January 2009, the U.S. Treasury Department froze the assets of four key al Qaeda operatives based in Iran, including Osama bin Laden's eldest son Saad bin Laden. Regarding the action, former Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, stated, "It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaeda."

40.     In fact, as reported as far back as 2003, since Saad bin Laden's "arrival in Iran… he has assumed a more active role in directing al Qaeda, and he has been identified as a senior leader." It is believed that Iran allowed Saad to relocate to Pakistan in late 2008.

41.     In March 2010, al Qaeda assisted Iran in negotiating the return of an Iranian diplomat who had been held captive by the Taliban in Pakistan for 15 months. This incident pointed to another dangerous sign of increased Iran-al Qaeda collaboration. In return for its help, Iran provided al Qaeda operatives based in its territory greater freedom of movement and loosened restrictions. As one example, al Qaeda's chief military strategist who reportedly now resides in Syria, Saif al-Adel, was allowed by Iran to travel to Pakistan and open more contacts with other al Qaeda leaders.

42.     Reports noted that remaining in Iran while possessing the freedom to travel "suggests that al-Adel and perhaps lower level al Qaeda figures now consider Iran a viable outpost, with fewer restrictions…" Furthermore, the "apparent easing of Iran's restrictions on al Qaeda… now opens up speculation that al-Adel could establish a 'satellite office' for the group in Iran."

43.     In July 2018, a United Nations panel of experts, called the Analytical Support and Sanctions Monitoring Team, appointed pursuant to resolutions 1526 (2004) and 2253 (2015), found that, "al Qaida leaders in the Islamic Republic of Iran have grown more prominent, working with A[y]man al-Zawahiri and projecting his authority more effectively than he could previously."

44.     In November 2020, Iran's ongoing harboring of al Qaeda operatives was exposed when the New York Times revealed that Abdullah Ahmed Abdullah, alias Abu Muhammad Al-Masri, was gunned down in Tehran on August 7, 2020, along with his daughter, the widow of Hamza Bin Laden. Iran initially sought to obfuscate the identity of the slain al Qaeda operative, reportedly al Qaeda's second in command at the time, with official media sources claiming the victims were a Lebanese history professor affiliated with Hezbollah and his daughter.

45.     Al-Masri ordered the al Qaeda bombings of U.S. embassies in Kenya in Tanzania on August 7, 1998. He was targeted for killing by two gunmen on a motorbike on the 22nd anniversary of those attacks. According to a senior U.S. official, Israeli agents acting at the behest of the U.S. carried out the assassination. Although initially under house arrest, al-Masri had reportedly been living freely in an upscale Tehran suburb since 2015. Israeli media cited intelligence sources that Iran provided a permissive environment from which al-Masri planned operations against Israeli and

Jewish targets around the world.

46.     From its Iranian safe haven, al Qaeda members have planned terrorist operations that have killed dozens of people, including Americans. From Iran, Saif al-Adl helped relay orders from Ayman al-Zawahiri to Tanzim Qaedat fi al-Jazeeratul Arab (the al Qaeda Organization on the Arabian Peninsula).

47.     For example, on May 12, 2003, al Qaeda commandos attacked residential compounds housing foreign workers in Riyadh, Saudi Arabia, killing 35 people, including 8 Americans. The attacks were reportedly planned and ordered by al Qaeda operatives in Iran, specifically Saif al-Adel and Sa'ad bin Laden. Through the U.N., the U.S. conveyed its "deep concern that individuals associated with al Qaeda have planned and directed the attack in Saudi Arabia from inside Iran."

48.     According to intelligence sources, Sa'ad was also involved in planning the April 11, 2002, suicide bombing of a Tunisian synagogue on April 11, 2002, that left 21 dead.

49.     An intercepted letter reportedly sent to the IRGC in 2008 by Ayman al-Zawahiri, al-Qaeda's current leader, revealed an even deeper relationship between Iran and al Qaeda than previously thought. The correspondence was sent after the September 19, 2008, attacks on the American embassy in Sana'a, Yemen, which killed 19 people. The Daily Telegraph states, "In the letter, al Qaeda's leadership pays tribute to Iran's generosity, stating that without its 'monetary and infrastructure assistance' it would not have been possible for the group to carry out the terror attacks. It also thanked Iran for having the 'vision' to help the terror organization establish new bases in Yemen after al-Qaeda was forced to abandon much of its terrorist infrastructure in Iraq and Saudi Arabia."

50.     Another prime example of the threat posed by al Qaeda's pipeline in Iran comes from an al Qaeda plot to derail a train going from New York to Toronto that was foiled in April 2013. After two of the terrorists had been arrested, Royal Canadian Mounted Police official James Malizia said, "the individuals were receiving support from al Qaeda elements in Iran."

51.     Following the U.S. invasion of Afghanistan, Iran also provided safe haven to al Qaeda operative Abu Musab al-Zarqawi, who went on to establish al Qaeda in Iraq, an al Qaeda offshoot that went on to kill and maim untold numbers of Iraqis and Americans, including the Plaintiff on October 17, 2005 in Habbaniya, Iraq.

52.     Zarqawi initially operated under the protection of the IRGC and its elite Quds Brigade. According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. While the Iranian regime eventually succumbed to U.S. pressure, forcing Zarqawi to leave Iran and arresting many of his personnel, the damage had already been done: Zarqawi's network was already rebuilt, even though the Iranian authorities could have prevented such an outcome at any time.

53.     Iran's support for Zarqawi and other al Qaeda leaders belies the assumption made by individuals in the intelligence community that Iran's arrest and deportation of al Qaeda members underscored Iran's cooperation in the U.S. War on Terror. In the words of terrorism analyst Thomas Joscelyn, "Iran's behavior can be explained by way of analogy. Like a corrupt cop in league with the mob, the Iranians have been willing to clamp down and turn over small-time operatives, while allowing bigger players to operate with impunity." Iran provided Zarqawi with such operational impunity.

54.     Documents leaked from U.S. military intelligence in 2010 "outline Iran's alleged role in brokering arms deals between North Korea and Pakistan-based militants, particularly militant leader Gulbuddin Hekmatyar and al Qaeda." In this deal, Hekmatyar reportedly departed from Iran to North Korea in 2005 "to close a deal with the North Korean government to obtain remote-controlled rockets to use against coalition aircraft in Afghanistan." Further intelligence reports revealed a 2005 "al Qaeda-Hekmatyar plot to equip suicide bombers and car bombs to attack Afghan government and international targets - using cars and equipment obtained in Iran." And lastly, an April 2007 report detailed an operation in which "al Qaeda, 'helped by Iran,' bought 72 air-to-air missiles from Algeria and hid them in Zahedan, Iran, in order to later smuggle them into Afghanistan."

## VII. ABU MUSAB AL-ZARQAWI AND THE TERROR ATTACK

55.     Al-Zarqawi was a Jordanian jihadist who ran a terrorist training camp in Afghanistan. He became known after going to Iraq in 2002 and organizing a series of bombings, beheadings, and attacks during the Iraq War, turning an insurgency against U.S. troops in Iraq into a Shia-Sunni civil war. He was also known as 'Sheikh of the Slaughterers'. *See* Weiss, Michael; Hassan, Hassan (2015). "Sheikh of the Slaughterers". ISIS: Inside the Army of Terror. Simon and Schuster.

56.     Al-Zarqawi formed al-Tawhid wal-Jihad in the 1990s, and led it until his death in June 2006. Zarqawi took responsibility, on several audio and video recordings, for numerous acts of violence in Iraq including suicide bombings, hostage executions, and the shootdown of a Marine Cobra helicopter in Ramadi, near Habbaniya. Zarqawi

opposed the presence of U.S. and Western military forces in the Islamic world, as well as the West's support for the existence of Israel.

57.     In late 2004, Al-Zarqawi joined al Qaeda, and pledged allegiance to Osama bin Laden. After this, al-Tawhid wal-Jihad became known as Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn, also known as al-Qaeda in Iraq (AQI), and al-Zarqawi was given the al Qaeda title "Emir of al Qaeda in the Country of Two Rivers" *See* Chehab, Zaki 2006, <u>Iraq Ablaze: Inside the Insurgency</u>, IB Tauris & Co, Cornwall, p. 8.

58.     From 2003-2006, Al-Zarqawi dispatched numerous suicide bombers and IED bombs throughout Iraq to attack American soldiers and areas with large concentrations of Shia militias. In September 2005, Al-Zarqawi declared "all-out war" on Shi'ites in Iraq, after the Iraqi government offensive on insurgents in the Sunni town of Tal Afar. He was also responsible for the 2005 bombing of three hotels in Amman, Jordan. See *Amman Bombings Reflect Zarqawi's Growing Reach* By Craig Whitlock, The Washington Post, Nov. 13, 2005.



**Fig. 1 – Abu Musab Al-Zarqawi, Terrorist Mastermind** and Recipient of Defendant's
Funding, Materiel, and Safe Harbor to Conduct Terror Operations in Iraq.

59.     Zarqawi was killed in a targeted strike by a joint U.S. force on June 7,

2006, while attending a meeting in an isolated safehouse in Hibhib, a small village

approximately 8 km (5.0 mi) west-northwest of Baqubah.

60.     Years before his death, Zarqawi began to obtain funds from Defendant and

through Defendant's ties to al Qaeda, in order to purchase advanced weaponry and

smuggle IED bombs and anti-tank shaped charges, capable of destroying U.S. tanks,

vehicles, and armored personnel carriers. Tanks were seen as an important tool (used by

the Americans) as these military assets are armored, provide crew protection, and can

withstand small-arms fire (AK-47s, grenades, RPGs) without damage. The tanks were

used by Coalition forces for stability and peacekeeping operations in support of the Provisional Authority and lawful government of Iraq.

61.     Through funding provided by Defendant, Zarqawi had access to large bank accounts and the capability to buy and smuggle from Iran into Iraq: custom-made IEDs and shaped-charge munitions (designed to destroy tanks) that were not used by the old or new Iraqi army.

62.     Zarqawi began to purchase these weapons, and smuggle them from Iran into Iraq to kill U.S. servicemembers and disable tanks. In fact, U.S. forces captured multiple IEDs that were built in Iran and were being transited into Iraq. These IEDs were Explosively Formed Penetrators (EFPs) that were engineered and built in Iran.

63.     The EFPs were compact but potent, and deployed against armored vehicles in a way similar to traditional IEDs but were much deadlier and more effective. However, the EFPs are also more complex and difficult to produce. *See* **Figs., 2-4** below.

64.     The EFPs were shaped like a coffee can but larger, with a concave end. The device is packed with plastic explosives that turn a copper plate into molten slugs that when exploded, pass through several inches of armor. The explosion sends molten and elongated shards of copper tumbling through bodies and vehicles, and produces entry and exit holes similar to gunshots.

65.     EFPs killed at least 196 U.S. troops and wounded nearly 900 between 2003 and 2011, defense officials revealed in 2015, and a high number of amputations throughout the war were the direct result of these terrorist weapons. *See* DoD discloses Data on Iraq War Deaths linked to Iran. MILITARY TIMES, Sept. 16, 2015.



**Fig. 2 – Iranian EFP (Explosively Formed Penetrator)** Used in the attack on Plaintiff.



**Fig. 3 – Components** of the Iranian EFP.

66.     Due to previous U.S. operations that destroyed Iraqi arms depots, Zarqawi needed to obtain newer munitions from Iran. The EFP used by Zarqawi's cell against targets in Iraq was purchased using funds provided by the Defendant and then smuggled from Iran into Iraq.

67.     During the invasion, and during his service with the 3rd Squadron, 7th Cavalry, Plaintiff encountered multiple IED attacks when he was patrolling Iraq and helping to recover vehicles, wounded soldiers, and the remains of U.S. soldiers who were killed in action.

68.     Plaintiff experienced multiple explosions, blast waves, and concussive trauma from these IED attacks.

69.     Plaintiff was knocked unconscious by the force of one IED blast and experienced headaches and difficulty concentrating. Unable to obtain medevac transport due to combat in the active warzone, Plaintiff obtained field treatment and continued to conduct his mission in Iraq.

70.     Mr. Espitia suffered a Traumatic Brain Injury (TBI), lower back injury, damaged disc, tinnitus, and PTSD from this incident. Plaintiff spent months recovering from his injuries.

71.     At the time, Al-Zarqawi and al Qaeda were operating in Iraq to kill U.S. forces and destabilize the provisional government. In November 2005, Al-Zarqawi claimed responsibility for multiple attacks on U.S. forces in Iraq and said its military wing, "Downed a Super Cobra attack helicopter in Ramadi with a Strella rocket, thanks be to God." The Associated Press also reported that al Qaeda in Iraq claimed responsibility, noting that it shot down a U.S attack helicopter near Ramadi and killed two U.S. Marines on November 2, 2005. *See* Al-Qaida Says It Shot Down U.S.

Helicopter, Killing Two, ASSOCIATED PRESS, November 4, 2005,

https://www.dailynews.com/2005/11/04/al-qaida-says-it-shot-down-us-helicopter-killing-

two (last visited Sep 19, 2019).

72.     Without Defendant's support, financing, and supervision of al Qaeda,

Plaintiff Anselmo Espitia, would not have been attacked and maimed during the invasion

and stabilization operations in Iraq from March 20, 2003 to June 2003.

73.     Plaintiff suffered permanent injuries from these Terrorist Attacks and IED

blasts, including: Traumatic Brain Injury, permanent memory loss, difficulty learning

new tasks, speech impairments, personality and behavioral changes, loss of reasoning

ability, loss of spacial perception, difficulty walking, dizziness, tinnitus, damaged disc,

PTSD and other injuries.

74.     Prior to the Terrorist Attack, Plaintiff planned to attend college and pursue

a career in law enforcement. After the attack, Plaintiff could not complete the coursework

due to his medical conditions and thus could not achieve his career goals.

75.     Plaintiff Espitia also still suffers and has lingering effects from the

Terrorist Attack, as he has struggled to find and maintain meaningful employment and

has difficulties communicating with his former wife, children, and mother. Plaintiff has

difficulties in his personal relationships and has recurring, severe nightmares. Plaintiff's

conditions led to the collapse of his first marriage and major depressive disorder and

cognitive disassociation condition.

76.     Defendant Islamic Republic of Iran has a long history of providing

funding, intelligence, logistics, support, and transportation to al Qaeda. Defendant's

actions and omissions were the proximate cause of the catastrophic injuries suffered by

Plaintiff Anselmo Espitia, and damages incurred by Plaintiff Anselmo Espitia, Espitia's

mother Ninfa Espitia, Espitia's daughter Breanna Espitia, and Anselmo Espitia's minor children M.E., and J.E.

## VIII. CAUSES OF ACTION

A.     **Plaintiff Anselmo Espitia's Cause of Action for the Personal Injury Against Iran and for Damages Under 28 USC § 1605A(c)**

77.     Plaintiff Anselmo Espitia repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff is the victim of a Terrorist Attack funded and supervised by Defendant Islamic Republic of Iran.

78.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

79.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack upon Plaintiff Anselmo Espitia.

80.     Iran conspired with al Qaeda to carry out the Terrorist Attack to destabilize Iraq and murder U.S. Servicemembers, including Plaintiff Anselmo Espitia.

81.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with al Qaeda to carry out the Terrorist Attack, all within the scope of their agency and office.

82.     Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with al Qaeda to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

83.     Al Qaeda is an agent of Iran, and it carried out the Terrorist Attack while

acting within the scope of its agency.

84.     The Terrorist Attack was an attempted extrajudicial murder and provision of material support and resources to al Qeada within the meaning of 28 U.S.C. § 1605A.

85.     The Terrorist Attack caused the Plaintiff Anselmo Espitia severe injury, including: pain and suffering (past, present, and future); economic damages (past, present, and future) and loss of income (past, present, and future); and severe emotional distress and mental anguish.

86.     The Terrorist Attack and the harm and injuries suffered by Plaintiff Anselmo Espitia were the direct and proximate result of Iran's conduct described herein.

87.     Iran is therefore liable for the full amount of Plaintiff Anselmo Espitia's damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

88.     Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

B.     **Plaintiff Breanna Espitia's Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

89.     Plaintiff Breanna Espitia repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff Breanna Espitia is the natural daughter Plaintiff Anselmo Espitia. Anselmo Espitia was the victim of a Terrorist Attack funded and supervised by Defendant Islamic Republic of Iran.

90.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

91.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack upon her father, Plaintiff Anselmo Espitia.

92.     Iran conspired with al Qaeda to carry out the Terrorist Attack to destabilize Iraq and murder U.S. Servicemembers, including Plaintiff's father, Anselmo Espitia.

93.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all within the scope of their agency and office.

94.     Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

95.     Al Qaeda is an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

96.     The Terrorist Attack on Plaintiff Breanna Espitia's father was an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

97.     The Terrorist Attack caused Plaintiff Breanna Espitia injuries, including: loss of guidance, loss of companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

98.     The Terrorist Attack and the harm and injuries suffered by Plaintiff

Breanna Espitia were the direct and proximate result of Iran's conduct described herein.

99.     Iran is therefore liable for the full amount of Plaintiff Breanna Espitia's damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

100.     Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

C.     **Plaintiff M.E.'s Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

101.     Plaintiff M.E., a minor and custodial child of Plaintiff Anselmo Espitia, repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff M.E., is one of Anselmo Espitia's three biological children. Plaintiff M.E.'s father is the victim of a Terrorist Attack funded and supervised by Defendant Islamic Republic of Iran.

102.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

103.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack upon M.E.'s father, Plaintiff Anselmo Espitia.

104.     Iran conspired with al Qaeda to carry out the Terrorist Attack to destabilize Iraq and murder U.S. Servicemembers, including Plaintiff M.E.'s father, Anselmo Espitia.

105.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and

facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all within the scope of their agency and office.

106.    Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

107.    Al Qaeda is an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

108.    The Terrorist Attack on Plaintiff M.E.'s father, Anselmo Espitia, was an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

109.    The Terrorist Attack caused the Plaintiff M.E. injuries, including: loss of guidance, loss of companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

110.    The Terrorist Attack and the harm and injuries suffered by Plaintiff M.E. were the direct and proximate result of Iran's conduct described herein.

111.    Iran is therefore liable for the full amount of Plaintiff M.E.'s damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

112.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

D.     **Plaintiff J.E.'s Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

113.     Plaintiff J.E., a minor and custodial child of Plaintiff Anselmo Espitia, repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff J.E., is one of Anselmo Espitia's three biological children. Plaintiff J.E.'s father is the victim of a Terrorist Attack funded and supervised by Defendant Islamic Republic of Iran.

114.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

115.     Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack upon J.E.'s father, Plaintiff Anselmo Espitia.

116.     Iran conspired with al Qaeda to carry out the Terrorist Attack to destabilize Iraq and murder U.S. Servicemembers, including Plaintiff J.E.'s father, Anselmo Espitia.

117.     MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all within the scope of their agency and office.

118.     Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

119.     Al Qaeda is an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

120.     The Terrorist Attack on Plaintiff J.E.'s father, Anselmo Espitia, was an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

121.     The Terrorist Attack caused the Plaintiff J.E. injuries, including: loss of guidance, loss of companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

122.     The Terrorist Attack and the harm and injuries suffered by Plaintiff J.E. were the direct and proximate result of Iran's conduct described herein.

123.     Iran is therefore liable for the full amount of Plaintiff J.E.'s damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

124.     Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

E.     **Plaintiff Ninfa Espitia's Cause of Action Against Iran and for Damages Under 28 USC § 1605A(c)**

125.     Plaintiff Ninfa Espitia is the natural mother of Anselmo Espitia, and repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff Ninfa Espitia is Anselmo Espitia's only surviving parent. Plaintiff Ninfa Espitia's son was the victim of a Terrorist Attack funded and supervised by Defendant Islamic Republic of Iran.

126.    Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

127.    Iran provided material support and resources to al Qaeda, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack upon Ninfa Espitia's son, Plaintiff Anselmo Espitia.

128.    Iran conspired with al Qaeda to carry out the Terrorist Attack to destabilize Iraq and murder U.S. Servicemembers, including Plaintiff Ninfa Espitia's son, Anselmo Espitia.

129.    MOIS, IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all within the scope of their agency and office.

130.    Iran's Officials and Agents are officials, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack on Anselmo Espitia, and conspired with al Qaeda to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

131.    Al Qaeda is an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

132.    The Terrorist Attack on Plaintiff Ninfa Espitia's son, Anselmo Espitia, was an attempted extrajudicial murder and provision of material support and resources to al Qaeda within the meaning of 28 U.S.C. § 1605A.

133.    The Terrorist Attack caused the Plaintiff Ninfa Espitia injuries, including: loss of guidance, loss of companionship and society; loss of consortium; severe

emotional distress and mental anguish; and loss of solatium.

134.    The Terrorist Attack and the harm and injuries suffered by Plaintiff Ninfa Espitia were the direct and proximate result of Iran's conduct described herein.

135.    Iran is therefore liable for the full amount of Plaintiff Ninfa Espitia's damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

136.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## IX. PRAYER

As a proximate cause of the foregoing, Plaintiff has suffered damages and seeks the following relief from the Defendant:

a.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $10,000,000 (ten million dollars) as to Plaintiff Anselmo Espitia;

b.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $3,000,000 (three million dollars) as to Plaintiff Breanna Espitia;

c.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $3,000,000 (three million dollars) as to Plaintiff M.E.;

d.    Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $3,000,000 (three million dollars) as to Plaintiff J.E.;

e.     Judgment against defendant Iran for compensatory damages in an amount to be determined at trial, which are not less than $3,000,000 (three million dollars) as to Plaintiff Ninfa Espitia;

f.     Judgment against Iran for punitive damages in an amount to be determined at trial;

g.     Plaintiff's costs and expenses

h.     Plaintiff's attorney's fees; and

i.     Such further relief as the Court finds just and equitable.

**WHEREFORE**, Plaintiff requests that upon trial of this cause, that Plaintiff obtain a judgment as authorized by law, and any other relief that Plaintiff may be entitled to.

DATED: AUGUST 12, 2021       Respectfully,

By:    /s/ R. Bruce Tharpe
        R. Bruce Tharpe

**LAW OFFICE OF
R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

ATTORNEY OF RECORD FOR
PLAINTIFF ANSELMO ESPITIA

32