UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANSELMO ESPITIA, ANSELMO ESPITIA as Parent and Joint Custodian of M.E., a minor child, ANSELMO ESPITIA, as Parent and Joint Custodian of J.E., a minor child, NINFA ESPITIA, and BREANNA ESPITIA | § § § § § § | CIVIL ACTION NO. 1:21-CV-123 |
| **Plaintiffs** | § § § | |
| VS. | § § | |
| ISLAMIC REPUBLIC OF IRAN | § § | |
| **Defendant** | § | |

## <u>MOTION FOR DEFAULT JUDGMENT</u>

Submitted by:

R. Bruce Tharpe, Atty-in-charge
**LAW OFFICE OF**
**R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

I. STATEMENT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. LEGAL STANDARDS FOR ENTRY OF DEFAULT JUDGMENT
     AGAINST FOREIGN SOVEREIGN DEFENDANTS . . . . . . . . . . .8

     A.  The Standards as to the Type and Quantum of Evidence
          Required for Default Judgments are Less Rigorous than
          those Required in Contested Cases . . . . . . . . . . . . . . . . . . . . . 9

III.  THE COURT HAS SUBJECT MATTER AND PERSONAL
      JURISDICITON OVER THIS ACTION AND THE PLAINTIFF
      ESTABLISHES THE ELEMENTS OF HIS CLAIM . . . . . . . . . . .11

     B.  Standards for Subject Matter Jurisdiction. . . . . . . . . . . . . . . . .11

     C.  Terrorism Exception Applies to Iran. . . . . . . . . . . . . . . . . . . . .12

IV. IRAN PROVIDED AL QAEDA WITH THE MATERIAL SUPPORT
     AND RESOURCES FOR THE TERRORIST ATTACK . . . . . . . . .18

V.  IRAN ACTED THROUGH ITS OFFICIALS, EMPLOYEES, OR
     AGENTS WHO WERE ACTING WITHIN THE SCOPE OF
     THEIR OFFICES, EMPLOYMENT, OR AGENCIES   . . . . . . . . 23

VI.  IRANIAN MATERIAL SUPPORT AND RESOURCES PROVIDED
     TO AL QAEDA CAUSED THE PLAINTIFF'S INJURIES AND
     DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII. IRAN'S SUPPORT OF AL QAEDA ESTABLISHES LIABILITY
     IN THE INSTANT CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

VIII. PLAINTIFF'S SUBSTANTIVE CLAIMS AGAINST IRAN . . . . . . 29

IX.  PLAINTIFF'S REQUESTED DAMAGES AND OTHER
      PLAINTIFFS' CLAIMS FOR LOSS OF SOLATIUM . . . . . . . . . . .30

      D.  Federal Precedent for Damages Due to Terrorist Attacks. . . . . . 30

      E.  State Precedent for Compensatory Damages for Traumatic
           Brain Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      F.  Plaintiff's Requested Compensatory Damages. . . . . . . . . . . . . . 33


PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

*Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 694 (7th Cir. 2012) . . . . . . . . . . . . . . . 28

*Acosta v. Islamic Republic of Iran,* 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) . . . . . . . . 27

*Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989) . . . . . . 11

*Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) . . . . . . . . . 27

*Ben-Rafael v. Islamic Republic of Iran,* 540 F. Supp. 2d 39, 54 (D.D.C. 2008) . . . . . . . 28

*Bluth v. Islamic Republic of Iran,* 203 F. Supp 3d 1, 17 (D.D.C. 2016) . . . . . . . . . . . . . 10

*Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 84 (D.D.C. 2006) . . . . . . . . . . . 27

*Boim v. Holy Land Foundation for Relief and Development,* 596 F.3d 685,
        695-698 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Braun v. Islamic Republic of Iran,* 228 F. Supp. 3d 64, 84 (D.D.C. 2018) . . . . . . .29, 30-31

*Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d 258, 273 (D.D.C. 2003). . . . . 30

*Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994). . . . . . .10

*Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion,*
        88 F.3d 948, 951 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dammarell, et al. v. Islamic Republic of Iran, et al.,* Civ. A. No. 01-2224(JDB),
        2006 U.S. Dist. LEXIS 63263 (D.D.C. 2006 Sept. 7, 2006). . . . . . . . . . . . . . . .30

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,* 894 F.3d 339,
        346 (D.C. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Estate of Doe v. Islamic Republic of Iran,* 808 F. Supp. 2d 1, 7 (D.D.C. 2011) . . . . . . . 10

*Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 27 (D.D.C. 1998)) . . . . . . . . . .27, 28

*Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017). . . . . . . . . . . 29

*Fraenkel v. Islamic Republic of Iran,* 892 F.3d 348, 361-62 (D.C. Cir. 2018). . . . . . . .31

*Fritz v. Islamic Republic of Iran,* 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018) . . . . . .29

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic,* 582 F.3d 393,
        399 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*GDG Acquisitions LLC v. Gov't of Belize,* 849 F.3d 1299, 1305 (11th Cir. 2017). . . . . .11

*Han Kim v. Democratic Peoples Republic of Korea,* 774 F.3d 1044, 1048-51
    (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Heiser v. Islamic Republic of Iran,* 466 F. Supp. 2d 229, 269 (D.D.C. 2006) . . . . . . 29, 31

*Hekmati v. Islamic Republic of Iran,* 278 F. Supp. 3d 145, 157 (D.D.C. 2017) . . . . . . . .8

*Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 150 (D.D.C. 2010) . . . . . . . . 25

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,,* 376 F.3d 1123,
    1128-29 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Menchaca v. National Trampoline Entertainment Center,* 334th District Court of
    Harris County, Texas, No. 201407366 (dec'd 2/26/2016). . . . . . . . . . . . . . . . . . 33

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.,* 863 F.3d 96 (2d Cir.
    2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cindy Montoya v. Billy Duane Williams and Advanced Simulation Technologies, Inc.,*
    70th District Court of Ector County, Texas, No. A-134,684 (dec'd 2/4/2015). . . 32

*Mwani v. Bin Laden,* 417 F.3d 1, 6 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Owens v. Republic of Sudan,* 864 F.3d 751, 788 (D.C. Cir. 2017) . . . . 9-10, 11, 13, 25-26

*People's Mojahedin Org. of Iran v. United States Dep't of State,*
    182 F.3d 17, 22 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 87 (D.C. Cir. 2002). 28

*Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) . . . . . . . . . . . .9

*Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 386 (D.D.C. 2015). . . . . . . . . . . 10

*Rux v. Republic of Sudan,* 461 F.3d 461, 473 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 25

*S & Davis Int'l, Inc. v. Yemen,* 218 F.3d 1292 (11th Cir. 2000) . . . . . . . . . . . . . . . . .27, 28

*Stansell v. Revolutionary Armed Forces of Colom. (FARC),* No. 8:09-cv-2308-
    T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. 2010) . . . . . . . . . . . . . . 10

*Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 33 (D.D.C. 2016). . . . . . . . . . .8

*TracFone Wireless v. Anadisk LLC,* 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010). . . . . . 8

*Valore v Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010) . . . . . 25, 29, 31

*Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1553 (11th Cir. 1993) . . . . . . . . . . .28

*West Star Transportation Inc. v. Charles and Cherie Robinson,* Court of Appeals,
      Seventh District of Texas, No. 07-13-00109-CV (dec'd 1/23/15) . . . . . . . . . . . 32

TO THE U.S. DISTRICT JUDGE:

**COMES NOW**, Plaintiff Anselmo Espitia and respectfully asks the District Court to issue a Default Judgment against Defendant Islamic Republic of Iran in accordance with Rule 55(b). The Defendant was served the lawsuit under the procedures noted by the FRCP. As of the current date, Defendant did not file an answer, a response, a dispositive motion, or otherwise defend or dispute the instant case and issues in controversy.

Plaintiff shows the Court as follows:

## I. STATEMENT OF CLAIM

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the Antiterrorism Act, 18 U.S.C. § 2333, and supplemental causes of action, seeking damages for personal injury and related torts, arising from multiple terrorist attacks and Improvised Explosive Device (IED) explosions incurred by Plaintiff ANCELMO ESPITIA on March 20, 2003 through June 2003 in the Sunni Triangle area of Iraq (location demarcated by Tikrit, Ramadi, Fallujah, and Baghdad) in which the Plaintiff was severely injured (the "Terrorist Attacks"). These attacks were planned by al Qaeda terrorist Abu Musab Al-Zarqawi with material support, weapons, training, and funding from Defendant Islamic Republic of Iran.

2.      Plaintiff Anselmo Espitia is currently a Texas resident and was a permanent resident of Texas at the time of the allegations giving rise to this cause of action. Plaintiff was a combat engineer and 62B construction equipment repairer, serving on active duty and attached to the 3rd Squadron, 7th Cavalry Regiment, 2nd Brigade Combat Team, Third Infantry Division.

Plaintiff was injured during peacekeeping operations, when he and his vehicle

7

were hit by multiple Improvised Explosive Devices (IEDs) and Explosively Formed Projectile (EFP) blasts in May 2003 to June 2003 in the various areas of Iraq. These IEDs and EFP shaped charges were built in Iran and designed to main, kill, murder, and destroy U.S. military personnel in their armored vehicles.

The IEDs and EFP shaped charges were built in Iran and designed to maim, kill, murder, and destroy U.S. military personnel in their armored vehicles.

3.      Defendant the Islamic Republic of Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603 and designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of attempted acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks, authorized and ratified the actions of its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attacks and the harm to the Plaintiff.

## II. LEGAL STANDARDS FOR ENTRY OF DEFAULT JUDGMENT AGAINST FOREIGN SOVEREIGN DEFENDANTS

4.      The entry of default judgment is governed by Fed. R. Civ. P. 55. Despite a defendant's refusal to respond to the complaint, "the entry of a default judgment is not automatic." *See Mwani v. Bin Laden,* 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, a plaintiff seeking a default judgment must establish both subject matter and personal jurisdiction. *See e.g. TracFone Wireless v. Anadisk LLC,* 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010); *Hekmati v. Islamic Republic of Iran,* 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

5.    Additionally, under the Foreign Sovereign Immunities Act (FSIA), plaintiffs must also prove their claims or right to relief by proffering evidence that is "satisfactory to the court." 28 U.S.C. § 1608(e); *See Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir. 1996); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").

6.    Plaintiff submits exhibits and his verified declaration based on his knowledge of relevant facts and circumstances surrounding the events giving rise to this action to establish the Defendant's liability.

A.    The Standards as to the Type and Quantum of Evidence Required for Default Judgments are Less Rigorous than those Required in Contested Cases.

7.    The FSIA requires plaintiffs seeking a default judgment against a foreign state to establish their claims "by evidence satisfactory to the court." 28 U.S.C. §1608(e). Section 1608(e), however, does not provide guidance as to the type or quantum of evidence that is deemed "satisfactory to the court." Notwithstanding the statutory void, courts are to be guided by established principles found in caselaw.

8.    First, neither § 1608(e) nor any other provision of the FSIA requires a court to base its decision upon a particular type of admissible evidence. *See Owens v. Republic of Sudan,* 864 F.3d 751, 788 (D.C. Cir. 2017). For example, in *Owens* the D.C. Circuit held that expert testimony, regardless of its form or type is admissible to prove ultimate facts, and that such expert testimony, standing alone, may satisfy the evidentiary burden of §1608(e). The *Owens* court added that eyewitness testimony or other direct

evidence are not necessary. *Id.* at 789.

Additionally, district courts have "an unusual degree of discretion over evidentiary rulings" in FSIA cases against a defaulting state sponsor of terrorism. *Id.* at 785. Because state sponsors of terrorism severely restrict the flow of information, including sources of admissible evidence, courts have allowed plaintiffs to prove their claims using evidence that might not be admissible at trial. *Id.,* citing *Han Kim v. Democratic Peoples Republic of Korea,* 774 F.3d 1044, 1048-51 (D.C. Cir. 2014). A plaintiff may not, however, rely exclusively upon inadmissible evidence. *Owens,* 864 F.3d at 785.

9. Second, § 1608(e) does not require a district court to conduct an evidentiary hearing so long as the plaintiff's allegations are supported by the evidence. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994). Plaintiffs may carry their burden of production through the submission of documentary evidence including affidavits and declarations*. Id.; Estate of Doe v. Islamic Republic of Iran,* 808 F. Supp. 2d 1, 7 (D.D.C. 2011); *see also, Bluth v. Islamic Republic of Iran,* 203 F. Supp 3d 1, 17 (D.D.C. 2016); *Stansell v. Revolutionary Armed Forces of Colom. (FARC),* No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. 2010) (court may forego a hearing where the plaintiffs submit detailed affidavits describing the nature and extent of their damages). Moreover, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *See Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

10. Finally, the quantum of evidence required for entry of summary judgment under § 1608(e) is the same as that required to defeat a defendant's motion for summary judgment. "To prevail in an FSIA default proceeding, the plaintiffs must present a legally

sufficient *prima facie* case, in other words, a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff." *See Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 150 (D.D.C. 2010). The plaintiff need only present enough evidence "to satisfy the judge that her claim has some factual basis." *Owens,* 864 F.3d at 785. Thus, under section 1608(e) the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens,* 864 F.3d at 785.

### III. THE COURT HAS SUBJECT MATTER AND PERSONAL JURISDICTION OVER THIS ACTION AND THE PLAINTIFF HAS ESTABLISHED THE ELEMENTS OF HIS CLAIM

B.  Standards for Subject Matter Jurisdiction

11.     28 U.S.C. 1330(a) provides district courts with subject matter jurisdiction over any non-jury civil action against a foreign state as to any claim for relief for which the foreign state is not immune under the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989); *GDG Acquisitions LLC v. Gov't of Belize,* 849 F.3d 1299, 1305 (11th Cir. 2017). Thus, subject matter jurisdiction lies only where the plaintiffs establish the applicability of a statutory exception to the foreign state defendant's immunity. *See* 28 U.S.C. §§ 1604-1607.

12.     The Court has subject matter jurisdiction over Defendant Iran under the terrorism exception to foreign sovereign immunity, which provides in part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office,

employment, or agency.

*See* 28 U.S.C. § 1605A(a)(1).

13.     In the instant case, these elements are all satisfied. The Plaintiff seeks money damages against Iran for personal injuries and death that were caused by Iran's provision of material support and resources for the attempted extrajudicial killing of Plaintiff Anselmo Espitia.

C. The Terrorism Exception Applies to Iran

14.     The terrorism exception allows claims to be heard only against foreign states that were designated as state sponsors of terrorism at the time of the act of terrorism and that remain so designated. *See* 28 U.S.C. § 1605A(a)(2). The term "state sponsor of terrorism" refers to countries, the governments of which have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism. *See* 28 U.S.C. § 1605A(h)(6). Iran is presently designated a state sponsor of terrorism and has been so designated since 1984.[1] *See* **Exhibit 1.**

15.     The terrorist attack on Anselmo Espitia was an attempted extrajudicial killing. Iran provided material support and resources to al Qaeda for the commission of acts of extra-judicial killing, including the attack on Anselmo Espitia. *See Original Complaint,* pages 17-22, items 57-66. Section 1605A adopts the definition of "extrajudicial killing," that is codified in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "extrajudicial killing to mean:

---

1 – *See* U.S. Department of State Country Reports on Terrorism 2019, see also 31 CFR § 596.201

"a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."

*See* 28 U.S.C.S. § 1350.

16.     "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens,* 864 F.3d at 770. The Terrorist attack on Anselmo Espitia satisfies all three elements, and it "does not fall within the exception for killings carried out under the authority of a foreign nation acting in accord with international law." *See id.*

17.     Plaintiff notes that he survived the attack, however he suffers from multiple permanent and deliberating conditions for which he seeks compensatory damages. Furthermore, Iran's liability is established under 28 U.S.C. § 1605A(a)(1), as Defendant provided material support and resources for the attack. *See* **Exhibits 1-8.**

18.     Abu Musab Al-Zarqawi was a Jordanian jihadist who ran a terrorist training camp in Afghanistan. He became known after going to Iraq in 2002 and organizing a series of bombings, beheadings, and attacks during the Iraq War, turning an insurgency against U.S. troops in Iraq into a Shia-Sunni civil war. He was also known as 'Sheikh of the Slaughterers'. *See* Weiss, Michael; Hassan, Hassan (2015). "Sheikh of the Slaughterers". ISIS: Inside the Army of Terror. Simon and Schuster.

19.     In late 2004, Al-Zarqawi joined al Qaeda, and pledged allegiance to Osama bin Laden. After this, al-Tawhid wal-Jihad became known as Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn, also known as al-Qaeda in Iraq (AQI), and al-Zarqawi was

given the al Qaeda title "Emir of al Qaeda in the Country of Two Rivers" *See* Chehab,

Zaki 2006, <u>Iraq Ablaze: Inside the Insurgency</u>, IB Tauris & Co, Cornwall, p. 8.

20.     In September 2005, Al-Zarqawi declared "all-out war" on Shi'ites in Iraq,

after the Iraqi government offensive on insurgents in the Sunni town of Tal Afar. Al-

Zarqawi dispatched numerous suicide bombers and IED bombs throughout Iraq to attack

American soldiers and areas with large concentrations of Shia militias. He was also

responsible for the 2005 bombing of three hotels in Amman, Jordan. *See Amman*

*Bombings Reflect Zarqawi's Growing Reach* By Craig Whitlock, The Washington Post,

Nov. 13, 2005.

21.     Zarqawi was killed in a targeted strike by a joint U.S. force on June 7,

2006, while attending a meeting in an isolated safehouse in Hibhib, a small village

approximately 8 km (5.0 mi) west-northwest of Baqubah.

22.     A year before his death, Zarqawi began to obtain funds from Defendant

and through Defendant's ties to al Qaeda, in order to purchase advanced weaponry and

smuggle IED bombs and anti-tank shaped charges, capable of destroying U.S. tanks,

vehicles, and armored personnel carriers. Tanks were seen as an important tool (used by

the Americans) as these military assets are armored, provide crew protection, and can

withstand small-arms fire (AK-47s, grenades, RPGs) without damage. The tanks were

used by Coalition forces for stability and peacekeeping operations in support of the

Provisional Authority and lawful government of Iraq.

23.     Through funding provided by Defendant, Zarqawi had access to large

bank accounts and the capability to buy and smuggle from Iran into Iraq: custom-made

IEDs and shaped-charge munitions (designed to destroy tanks) that were not used by the

old or new Iraqi army.

24.     Zarqawi began to purchase these weapons, and smuggle them from Iran into Iraq to kill U.S. servicemembers and disable tanks. In fact, U.S. forces captured multiple IEDs that were built in Iran and were being transited into Iraq. These IEDs were Explosively Formed Penetrators (EFPs) that were engineered and built in Iran.

25.     The EFPs were compact but potent, and deployed against armored vehicles in a way similar to traditional IEDs but were much deadlier and more effective. However, the EFPs are also more complex and difficult to produce. *See* **Figs., 1-3** below.

26.     The EFPs were shaped like a coffee can but larger, with a concave end. The device is packed with plastic explosives that turn a copper plate into molten slugs that when exploded, pass through several inches of armor. The explosion sends molten and elongated shards of copper tumbling through bodies and vehicles, and produces entry and exit holes similar to gunshots.

27.     EFPs killed at least 196 U.S. troops and wounded nearly 900 between 2005 and 2011, defense officials revealed in 2015, and a high number of amputations throughout the war were the direct result of these terrorist weapons. *See* DoD discloses Data on Iraq War Deaths linked to Iran. MILITARY TIMES, Sept. 16, 2015.



**Fig. 1 – Iranian EFP (Explosively Formed Penetrator)** used in the attack on Plaintiff Anselmo Espitia



**Fig. 2 – Components** of the Iranian EFP

28.     Due to previous U.S. operations that destroyed Iraqi arms depots, Zarqawi needed to obtain newer munitions from Iran. The EFP used by Zarqawi's cell against Plaintiff Anselmo Espitia was purchased using funds provided by the Defendant and then the components were smuggled from Iran into Iraq.

29.     During the invasion, and during his service with the 3rd Squadron, 7th Cavalry, Plaintiff encountered multiple IED attacks when he was patrolling Iraq and helping to recover vehicles, wounded soldiers, and the remains of U.S. soldiers who were killed in action.

30.     Plaintiff experienced multiple explosions, blast waves, and concussive trauma from these IED attacks.

31.     Plaintiff was knocked unconscious by the force of one IED blast and experienced headaches and difficulty concentrating. Unable to obtain medevac transport due to combat in the active warzone, Plaintiff obtained field treatment and continued to conduct his mission in Iraq.

32.     Mr. Espitia suffered a Traumatic Brain Injury (TBI), lower back injury, damaged disc, tinnitus, and PTSD from this incident. Plaintiff spent months recovering from his injuries. Mr. Espitia planned to take college courses online and enter Officer Candidate School to become a commissioned Officer in the Army. However, due to the terrorist attacks, Espitia suffered from long-term injuries including difficulty with speech, short-term memory, behavioral changes, and difficulty communicating with others. Thus, Plaintiff could no longer qualify to complete his Army service as a commissioned Officer.

33.     At the time, Al-Zarqawi and al Qaeda were operating in the Al Anbar province, and specifically the Ramadi and Habbaniya areas. Later, in November 2005,

Al-Zarqawi claimed responsibility for multiple attacks on U.S. forces in Iraq and said its

military wing, "Downed a Super Cobra attack helicopter in Ramadi with a Strella rocket,

thanks be to God." The Associated Press also reported that al Qaeda in Iraq claimed

responsibility, noting that it shot down a U.S attack helicopter near Ramadi and killed

two U.S. Marines on November 2, 2005. See Al-Qaida Says It Shot Down U.S.

Helicopter, Killing Two, ASSOCIATED PRESS, November 4, 2005,

https://www.dailynews.com/2005/11/04/al-qaida-says-it-shot-down-us-helicopter-killing-

two (last visited Sep 19, 2019).

34.     Without Defendant's support, financing, and supervision of al Qaeda,

Plaintiff Anselmo Espitia, would not have been attacked and maimed while on

peacekeeping operations from May to June 2003 in Iraq.


### IV. IRAN PROVIDED AL QAEDA WITH MATERIAL SUPPORT AND RESOURCES FOR THE TERRORIST ATTACK

35.     After the launch of Operation Enduring Freedom in October 2001 in

response to the September 11 attacks, many members of al-Qaeda, including Osama bin

Laden, fled to the lawless Federally Administered Tribal Areas of Western Pakistan. Key

elements of al Qaeda leadership also escaped to Iran, with Iranian authorities' assistance.

In late 2001, for example, a senior al Qaeda operative based in Iran, Mustafa Hamid,

negotiated with the Iranian government to relocate al Qaeda families to Iran.

36.     In 2003, The Washington Post reported on a "decade-old relationship"

between Ayman al-Zawahiri, then al Qaeda's second-in-command, and Ahmad Vahidi,

Iran's former Minister of Defense. In 2001, Vahidi reportedly provided "safe harbor for

some al-Qaeda leaders who were trapped in the mountains of Tora Bora" following

negotiations with al-Zawahiri. According to a European intelligence analyst, "The [Iranian Quds] Force's senior leaders have longstanding ties to al Qaeda, and since the fall of Afghanistan, have provided al Qaeda leaders with travel documents and safe haven.

37.     Under such arrangements, key members of al-Qaeda's operational structure came to reside in Iran, including such infamous figures as Saif al-Adel (Security Chief), Saad bin Laden (Osama's son, Senior al Qaeda Operative), Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri, CFO of al Qaeda) and Abu Musab al-Zarqawi (future Chief of al Qaeda in Iraq).

38.     Notionally, Iran held these al Qaeda operatives under "house arrest," but in reality, al Qaeda was using Iran as a base of operations under the protection of the Quds Force. One al Qaeda member noted that there were several stages of restrictions, but in the end, it was "not really house arrest but rather a hospitality." By providing al Qaeda operatives such sanctuary, Iran has been in direct violation of U.N. Security Council Resolution 1390, which prohibits the harboring of al Qaeda members.

39.     Abu Hafs Mauritani, a leading figure of al Qaeda who was in Iran for roughly a decade after 9/11, revealed that al Qaeda members agreed not to carry out attacks from within Iran in exchange for maintaining a safe haven there. Over the next decade, as a means to further its own regional goals, the Iranian regime would permit al Qaeda to use its territory to plan terrorist attacks abroad as well as transit money, arms, and fighters across the region.

40.     Since 2001, Iran has harbored key al Qaeda operatives. After the 9/11 attacks, al Qaeda's operational structure split into two groups – Iran and Pakistan. The first part of al Qaeda's main operational structure was sent to Iran. This group was led by

the head of al Qaeda's Security Committee, Saif al-Adl, and the head of al Qaeda's Training Sub-Section, Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri). The group also came to include Osama bin Laden's two sons Hamza and Saad bin Laden.

41.     In its 2010 "Country Reports on Terrorism," the U.S. State Department wrote that "Iran has repeatedly resisted numerous calls to transfer custody of its al Qaeda detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al Qaeda members who fled to Iran following the fall of the Taliban regime in Afghanistan." *See* **Exhibit 3.**

42.     In January 2009, the U.S. Treasury Department froze the assets of four key al Qaeda operatives based in Iran, including Osama bin Laden's eldest son Saad bin Laden. Regarding the action, former Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, stated, "It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaeda." *See* **Exhibit 4.**

43.     In fact, as reported as far back as 2003, since Saad bin Laden's "arrival in Iran… he has assumed a more active role in directing al Qaeda, and he has been identified as a senior leader." It is believed that Iran allowed Saad to relocate to Pakistan in late 2008.

44.     In March 2010, al Qaeda assisted Iran in negotiating the return of an Iranian diplomat who had been held captive by the Taliban in Pakistan for 15 months. This incident pointed to another dangerous sign of increased Iran-al Qaeda collaboration. In return for its help, Iran provided al Qaeda operatives based in its territory greater freedom of movement and loosened restrictions. As one example, al Qaeda's chief military strategist who reportedly now resides in Syria, Saif al-Adel, was allowed by Iran to travel to Pakistan and open more contacts with other al Qaeda leaders.

45.     Reports noted that remaining in Iran while possessing the freedom to travel "suggests that al-Adel and perhaps lower level al Qaeda figures now consider Iran a viable outpost, with fewer restrictions…" Furthermore, the "apparent easing of Iran's restrictions on al Qaeda… now opens up speculation that al-Adel could establish a 'satellite office' for the group in Iran."

46.     In July 2018, a United Nations panel of experts, called the Analytical Support and Sanctions Monitoring Team, appointed pursuant to resolutions 1526 (2004) and 2253 (2015), found that, "al Qaida leaders in the Islamic Republic of Iran have grown more prominent, working with A[y]man al-Zawahiri and projecting his authority more effectively than he could previously." *See* **Exhibit 5.**

47.     In November 2020, Iran's ongoing harboring of al Qaeda operatives was exposed when the New York Times revealed that Abdullah Ahmed Abdullah, alias Abu Muhammad Al-Masri, was gunned down in Tehran on August 7, 2020, along with his daughter, the widow of Hamza Bin Laden. Iran initially sought to obfuscate the identity of the slain al Qaeda operative, reportedly al Qaeda's second in command at the time, with official media organs claiming the victims were a Lebanese history professor affiliated with Hezbollah and his daughter. *See* **Exhibit 6.**

48.     Al-Masri ordered the al Qaeda bombings of U.S. embassies in Kenya in Tanzania on August 7, 1998. He was targeted for killing by two gunmen on a motorbike on the 22nd anniversary of those attacks. According to a senior U.S. official, Israeli agents acting at the behest of the U.S. carried out the assassination. Although initially under house arrest, al-Masri had reportedly been living freely in an upscale Tehran suburb since 2015. Israeli media cited intelligence sources that Iran provided a permissive environment from which al-Masri planned operations against Israeli and

Jewish targets around the world.

49.     From its Iranian safe haven, al Qaeda members have planned terrorist operations that have killed dozens of people, including Americans. From Iran, Saif al-Adl helped relay orders from Ayman al-Zawahiri to Tanzim Qaedat fi al-Jazeeratul Arab (the al Qaeda Organization on the Arabian Peninsula).

50.     For example, on May 12, 2003, al Qaeda commandos attacked residential compounds housing foreign workers in Riyadh, Saudi Arabia, killing 35 people, including eight Americans. The attacks were reportedly planned and ordered by al Qaeda operatives in Iran, specifically Saif al-Adel and Sa'ad bin Laden. Through the U.N., the U.S. conveyed its "deep concern that individuals associated with al Qaeda have planned and directed the attack in Saudi Arabia from inside Iran."

51.     According to intelligence sources, Sa'ad was also involved in planning the April 11, 2002, suicide bombing of a Tunisian synagogue on April 11, 2002, that left 21 dead.

52.     An intercepted letter reportedly sent to the IRGC in 2008 by Ayman al-Zawahiri, al-Qaeda's current leader, revealed an even deeper relationship between Iran and al Qaeda than previously thought. The correspondence was sent after the September 19, 2008, attacks on the American embassy in Sana'a, Yemen, which killed 19 people. The Daily Telegraph states, "In the letter, al Qaeda's leadership pays tribute to Iran's generosity, stating that without its 'monetary and infrastructure assistance' it would not have been possible for the group to carry out the terror attacks. It also thanked Iran for having the 'vision' to help the terror organization establish new bases in Yemen after al-Qaeda was forced to abandon much of its terrorist infrastructure in Iraq and Saudi Arabia." *See* **Exhibit 7.**

53.     Another prime example of the threat posed by al Qaeda's pipeline in Iran comes from an al Qaeda plot to derail a train going from New York to Toronto that was foiled in April 2013. After two of the terrorists had been arrested, Royal Canadian Mounted Police official James Malizia said, "the individuals were receiving support from al Qaeda elements in Iran." *See* **Exhibit 8.**

### V.  IRAN ACTED THROUGH ITS OFFICIALS, EMPLOYEES, OR AGENTS WHO WERE ACTING WITHIN THE SCOPE OF THEIR OFFICES, EMPLOYMENT, OR AGENCIES

54.     Following the U.S. invasion of Afghanistan, Iran also provided safe haven to al Qaeda operative Abu Musab al-Zarqawi, who went on to establish al Qaeda in Iraq, an al Qaeda offshoot that went on to murder untold numbers of Iraqis and Americans.

55.     Zarqawi initially operated under the protection of the IRGC and its elite Quds Brigade. According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. While the Iranian regime eventually succumbed to U.S. pressure, forcing Zarqawi to leave Iran and arresting many of his personnel, the damage had already been done: Zarqawi's network was already rebuilt, even though the Iranian authorities could have prevented such an outcome at any time.

56.     Iran's support for Zarqawi and other al Qaeda leaders belies the assumption made by individuals in the intelligence community that Iran's arrest and deportation of al Qaeda members underscored Iran's cooperation with the U.S. War on Terror. In the words of terrorism analyst Thomas Joscelyn, "Iran's behavior can be explained by way of analogy. Like a corrupt cop in league with the mob, the Iranians

have been willing to clamp down and turn over small-time operatives, while allowing bigger players to operate with impunity." Iran provided Zarqawi with such operational impunity.

57.    Documents leaked from U.S. military intelligence in 2010 "outline Iran's alleged role in brokering arms deals between North Korea and Pakistan-based militants, particularly militant leader Gulbuddin Hekmatyar and al Qaeda." In this deal, Hekmatyar reportedly departed from Iran to North Korea in 2005 "to close a deal with the North Korean government to obtain remote-controlled rockets to use against coalition aircraft in Afghanistan." Further intelligence reports revealed a 2005 "al Qaeda-Hekmatyar plot to equip suicide bombers and car bombs to attack Afghan government and international targets - using cars and equipment obtained in Iran." And lastly, an April 2007 report detailed an operation in which "al Qaeda, 'helped by Iran,' bought 72 air-to-air missiles from Algeria and hid them in Zahedan, Iran, in order to later smuggle them into Afghanistan."

## VI. IRANIAN MATERIAL SUPPORT AND RESOURCES PROVIDED TO AL QAEDA CAUSED THE PLAINTIFF'S INJURIES AND DAMAGES

58.    28 U.S.C. § 1605A(a) includes a proximate causation element. *See Ben-Rafael v. Islamic Republic of Iran,* 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,,* 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). The causation element of § 1605A, does not require that Plaintiffs prove that the injury would not have happened but for the defendant's actions. *Kilburn,* 376 F.3d at 1128. Neither must they establish a close temporal or spatial proximity between the harm and the action that caused it. *Rux v. Republic of Sudan,* 461 F.3d 461, 473 (4th Cir. 2006),

citing *Kilburn,* 376 F.3d at 1128.

59.     Rather, proximate cause under §1605A is established by demonstrating "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens v. Republic of Sudan,* 864 F.3d 751, 794 (D.C. Cir. 2017); *Valore v Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010). And, the mere fact that al Qaeda and its operatives may have themselves been but for causes of the Plaintiff's injuries does not break the causal chain of Iran's actionable conduct. "Such a case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,* 894 F.3d 339, 346 (D.C. Cir. 2018) citing *Kilburn* 376 F.3d at 1129.

60.     Finally, proximate cause does not require the Plaintiff to show the defendant specifically intended or directly advanced their injuries. *Owens,* 864 F.3d at 799; *Kilburn,* 376 F.3d at 1128-29. As the *Kilburn* court noted, material support is difficult to trace. 376 F.3d at 1128. Accordingly, the D.C. Circuit, in a unanimous decision by Judges Garland, Ginsburg, and then-Judge John Robert, adopted a flexible standard for causation under the terrorism exception to jurisdictional immunity.[2] *Kilburn,* 376 F.3d at 1128-29. The Court noted that material support is difficult to trace *Id.* at 1129 cf., *Boim v. Holy Land Foundation for Relief and Development,* 596 F.3d 685, 695-698 (7th Cir. 2008) (en banc) (finding causation and liability under the Anti-Terrorism Act against a U.S.-based organization that provided funds to Hamas, which killed an American teen-ager in a drive-by shooting).

61.     In *Owens,* the D.C. Circuit held that proximate cause requires (a) that the defendant's actions must be a "substantial factor" in the sequence of events leading to the

plaintiff's injury, and (b) that the injury must have been a reasonably foreseeable or anticipated consequence of the defendant's conduct. *Owens,* 864 F.3d at 794. Iranian material support was certainly a substantial factor in the sequence of events leading to the murder of Gerald White.

62.     Plaintiff has alleged and provided copious reports and evidence that Iran supported al Qaeda in Iraq, after the invasion of Iraq, to destabilize the newly-created provisional Government of Iraq and promote Iran's desire for a powerful Shia-controlled geopolitical alliance of Iraq and Iran. *See* **Exhibits 1-8.**

63.     The Terrorist attack on Plaintiff Anselmo Espitia was also both a reasonably foreseeable and anticipated consequence of Iran's policy of providing material support to al Qaeda in Iraq. The very purpose of Iran's support was to destabilize Iraq and start a fresh civil war by creating a Sunni power vacuum and filling the vacuum with Shiite-friendly and Iranian-aligned terrorist groups. *See* **Exhibits 1-8.**

64.     This intent, coupled with the extensive efforts made by Iran through its officials, employees and agents to maintain al Qaeda as a menacing terrorist organization (as discussed at length above) easily demonstrates that the Terrorist attack on Anselmo Espitia was a reasonably foreseeable and anticipated consequence of Iran's conduct.

## VII. IRAN'S SUPPORT OF AL QAEDA ESTABLISHES LIABILITY IN THE INSTANT CASE

65.     The agreements between Iran and al Qaeda (and Iran's comprehensive

_____

2 - *Kilburn* was decided under an earlier version of the terrorism exception that was then codified at 28 U.S.C. § 1605(a)(7). However, in *Owens,* 864 F.3d at 794, the D.C. Circuit reaffirmed *Kilburn's* analysis of the causation standard for the jurisdictional immunity exception, and applied it to the current terrorism exception found in 1605A(a).

involvement with al Qaeda's operations in Iraq and al Qaeda's terrorist activities) demonstrate that Iran was not only a supporter of al Qaeda, but that the two were co-conspirators.

66.    "The very sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) (quoting *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 84 (D.D.C. 2006) and *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 27 (D.D.C. 1998)) (quotation marks omitted)). *See also Acosta v. Islamic Republic of Iran,* 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) (same). Because Iran and al Qaeda were co-conspirators, Iran is liable not only for providing material support and resources for the Terrorist Murder; it is also directly liable for the extrajudicial killing of Gerald White.

67.    "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *See S & Davis Int'l, Inc. v. Yemen,* 218 F.3d 1292 (11th Cir. 2000) (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process); *see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.,* 863 F.3d 96 (2d Cir. 2017). "Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state are required." *See Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1553 (11th Cir. 1993) (citations omitted).

68.    Moreover, every federal court of appeals to have addressed the issue has held that "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 87 (D.C. Cir. 2002) (foreign states are not "persons" entitled to

due process); *see also, Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 694 (7th Cir. 2012) (same); *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic,* 582 F.3d 393, 399 (2d Cir. 2009) (same); cf., *People's Mojahedin Org. of Iran v. United States Dep't of State,* 182 F.3d 17, 22 (D.C. Cir. 1999) ("No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy."). The Eleventh Circuit has not expressly held whether foreign states have due process rights. For example, in *S & Davis Int'l,* 218 F.3d, the court of appeals found it unnecessary to address the question because due process requirements were met.

69.     Plaintiff asks the Court to follow the rulings of the Second, Seventh and District of Columbia Circuits and hold that the personal jurisdiction inquiry as to foreign state defendants does not require due process analysis. However, even if a foreign state is deemed a "person" for purposes of due process analysis, "a foreign state that sponsors terrorist activities which causes the death or personal injury of a United States national will invariably have sufficient contacts with the United States to satisfy Due Process." *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 23 (D.D.C. 1998).

70.     As recounted in Plaintiff's motion for clerk's entry of default, service upon Iran was made properly under 28 U.S.C. § 1608(a)(3). The Defendant was served the summons, complaint, coversheet, and translation in accordance with the FRCP. As of this date, Defendant has refused to defend the instant case or deny its liability for the injuries suffered by Anselmo Espitia.

## VIII. PLAINTIFF'S SUBSTANTIVE CLAIMS AGAINST IRAN

71.     The Plaintiff's substantive claims arise primarily under the FSIA's

statutory cause of action for state sponsorship of terrorism. *See Original Complaint,* pg 8, item 25, line 4; 28 U.S.C.§ 1605A(c). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *See Fritz v. Islamic Republic of Iran,* 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018), quoting, *Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz,* 2018 U.S. Dist. LEXIS at *86.

72.    In support of this Motion, Plaintiff submits a proposed order, supported by verified declarations and other exhibits documenting all facts necessary to support a damages award and entry of judgment therewith. Plaintiff asks the Court to follow the precedent in *Fritz* and *Foley* and provide the Plaintiff relief via an award of compensatory damages.

73.    A Federal Court awarding compensatory damages in a wrongful death claim may refer to State-level jury verdicts to establish the range for an award. Plaintiff will ask the Court to rely on prior Federal precedent for personal injury claims due to terrorist attacks and recent State-level jury verdicts for traumatic brain injury. *See Braun,* 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran,* 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

## IX. PLAINTIFF'S REQUESTED DAMAGES AND OTHER PLAINTIFFS' CLAIMS FOR LOSS OF SOLATIUM

### D.  Federal Precedent for Personal Injury due to Terrorist Attacks and Solatium Damages

74.     The Plaintiff, Anselmo Espitia, is requesting compensatory damages for the injuries he suffered as a result of multiple IED/EFP blasts he suffered from May 2003 to June of 2003. Other Federal Courts have awarded compensatory damages to survivors of terrorist attacks organized by the Defendant Islamic Republic of Iran. *See Dammarell, et al. v. Islamic Republic of Iran, et al.,* Civ. A. No. 01-2224(JDB), 2006 U.S. Dist. LEXIS 63263 (D.D.C. 2006 Sept. 7, 2006).

75.     Federal Courts have also allowed families to recover compensatory damages for the severe emotional injuries they suffered (as a result of terror attacks upon family members). These damages are known as solatium damages. 28 U.S.C. § 1605(c); *See Braun v. Islamic Republic of Iran,* 228 F. Supp. 3d 64, 84 (D.D.C. 2018). Solatium claims compensate plaintiffs for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent or terror victim experience as a result of the victim's death or severe incapacitation, as well as the harm caused by the loss of society and comfort. *See Braun,* 228 F. Supp. 3d at 84 (citations omitted). "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d 258, 273 (D.D.C. 2003).

76.     Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *See Braun,* 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran,* 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 85 (D.D.C. 2010). Applying this methodology, courts have formulated a widely-

accepted framework for calculations of damages awarded to victims of international terrorism. In *Heiser,* 466 F. Supp. 2d at 269 (D.D.C. 2006), the court surveyed past terrorism awards in the context of deceased victims of terrorism, and found that parents of those killed in terrorist attacks typically received damages awards of $5 million and siblings received $2.5 million.[3] The court also specified "baseline" amounts awarded to other relatives, such as spouses. *See id.*

77.    In *Braun v. Islamic Republic of Iran,* 228 F. Supp. 3d 64, 86 (D.D.C. 2017), the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist attack. The D.C. Circuit recently agreed that the *Heiser* framework reflects reasonable baseline awards, and reaffirmed that "past solatium awards from comparable cases are appropriate sources of guidance for district courts." *Fraenkel v. Islamic Republic of Iran,* 892 F.3d 348, 361-62 (D.C. Cir. 2018). The Fraenkel court held that while *Heiser* is not binding on other courts, it provides a "useful reference point" to which courts may adhere or depart upwards or downwards in their damages awards, depending upon the circumstances of the case and the discretion of the judge. *Fraenkel,* 892 F.3d at 351. The Court may apply the *Heiser* framework to the calculation of non-economic damages in the instant case.

## E.   State Precedent for Personal Injury (TBI) and Compensatory Damages for Loss of Solatium

78.    Plaintiff also asks the Court to consider recent Texas jury awards as a reference point for an appropriate compensatory damages award on a case that involves

---

3 – The *Heiser* decision was issued in 2006. Plaintiff asks the Court to follow the *Heiser* precedent, but adjust the award upward on the basis of inflation (since 2006) and the circumstances of the terror attacks on the Plaintiff.

Traumatic Brain Injury. Plaintiff cites the jury verdict in *Robinson v. West Star Transportation,* where the jury awarded the plaintiff compensatory damages of $5.3 Million. In 2015, The Texas Court of Appeals for the Seventh District affirmed the judgment and ruled that the award amount was appropriate. *See West Star Transportation Inc. v. Charles and Cherie Robinson,* Court of Appeals, Seventh District of Texas, No. 07-13-00109-CV (dec'd 1/23/15).

79.     The injuries in *Robinson* were Traumatic Brain Injury with no loss of limbs or paraplegia. The breakdown in *Robinson* was as follows: $300,000 for past physical pain and mental anguish; $700,000 for future physical pain and mental anguish; $168,540 for past loss of earning capacity; $243,184 for future loss of earning capacity; $5,000 for past physical impairment; $378,718 for past medical care; $3,337,857 for future medical care, and $400,000 to his wife for loss of consortium.

80.     Plaintiff cites the verdict in *Montoya v. Williams,* et al, issued on February 4, 2015, where the 70th State District Court of Ector County, Texas found the Defendant liable in the amount of $3,655,130 for the plaintiff's mild traumatic brain injury disorder that included seizures. *See Cindy Montoya v. Billy Duane Williams and Advanced Simulation Technologies, Inc.,* 70th District Court of Ector County, Texas, No. A-134,684 (dec'd 2/4/2015).

81.     Plaintiff also cites the verdict in *Menchaca v. National Trampoline Entertainment Center,* issued on February 26, 2016, where a jury for the 334th State District Court of Harris County, Texas found the Defendant liable in the amount of $5,000,000 for compensatory damages and $ 6,000,000 for punitive damages as a result of the defendant's negligence that caused the plaintiff's Traumatic Brain Injury. *See*

*Menchaca v. National Trampoline Entertainment Center,* 334th District Court of Harris County, Texas, No. 201407366 (dec'd 2/26/2016).

82.     In the three Texas cases cited by Plaintiff: *Robinson, Montoya,* and *Menchaca,* the injuries are consistent with the injuries incurred by Anselmo Espitia in the instant case: difficulty concentrating, problems with short-term memory, dizziness, behavioral changes, loss of function, and loss of earning capacity. *See* **Exhibit 9.**

83.     Plaintiff asks the Court to follow the Texas precedents on compensatory damages due to Traumatic Brain Injury (TBI).

F. <u>Plaintiffs' Requested Compensatory Damages</u>

84.     The decisions rendered in *Robinson, Montoya,* and *Menchaca* were not considered made by *runaway juries*. Nor was any allegation or argument made that the verdicts were excessive. Compared with the instant case, the Plaintiff's damages are consistent because Plaintiff Anselmo Espitia's injuries greatly reduce his ability to function, concentrate, read, remember information, and stay employed. Mr. Espitia also lost the ability to enter his desired vocation: a commissioned Officer in the Army and a military retirement pension valued at nearly $2 Million dollars.

85.     Plaintiffs request Damages in the following amounts:

a)     $5,000,000 compensatory damages to Anselmo Espitia;

b)     $1,000,000 loss of solatium damages to Ninfa Espitia, the
            Plaintiff's mother;

c)     $1,500,000 loss of solatium damages to Anselmo Espitia's
            son, M.E.;

d)     $1,500,000 loss of solatium damages to Anselmo Espitia's

son, J.E.; and

e)      $1,500,000 loss of solatium damages to Anselmo Espitia's

daughter, Breanna Espitia.

82.     Plaintiff requests that the Court follow the *Dammarell, Heiser,* and *Braun*

decisions. Plaintiff also notes that the Court may grant this motion without a hearing. *See*

*Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994).


### PRAYER FOR RELIEF

THEREFORE, Mr. Espitia respectfully requests that the District Court enter a

Judgment against Defendant Islamic Republic of Iran in accordance with this Motion,

Proposed Order, and Judgment herein.


DATED:  FEBRUARY 18, 2022          Respectfully submitted,

By:      /s/ R. Bruce Tharpe
         R. Bruce Tharpe

         **LAW OFFICE OF**
         **R. BRUCE THARPE, PLLC**
         PO Box 101
         Olmito, TX 78575
         (956) 255-5111 (Tel)

         ATTORNEY OF RECORD FOR
         PLAINTIFF ANSELMO ESPITIA


CERTIFICATE OF SERVICE

I, R. BRUCE THARPE, do hereby certify that on February 18, 2022, this Motion was
served on all parties of record via the SDTX_USDC electronic case filing system.

Additionally, a copy of this filing was mailed to the Defendant at the Foreign Ministry of Iran, Imam Kkomeni St, Imam Khomeni Sq, Tehran, Iran 11369114811 via Canada Post.

/s/ R. Bruce Tharpe
R. BRUCE THARPE,
ATTORNEY OF RECORD FOR
PLAINTIFF ANSELMO ESPITIA