UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANSELMO ESPITIA, ANSELMO ESPITIA as Parent and Joint Custodian of M.E., a minor child, ANSELMO ESPITIA, as Parent and Joint Custodian of J.E., a minor child, NINFA ESPITIA, and BREANNA ESPITIA | § § § § § § | CIVIL ACTION NO. 1:21-CV-123 |
| **Plaintiffs** | § § § | |
| VS. | § § | |
| ISLAMIC REPUBLIC OF IRAN | § § | |
| **Defendant** | § | |

### SUPPLEMENTAL BRIEF ON LIABILITY
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Submitted by:

R. Bruce Tharpe, Atty-in-charge
**LAW OFFICE OF**
**R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

I. *KARCHER* COURT DETERMINED IRAN LIABLE IN MASS
      TORT ACTION, BELLWETHER TRIALS ESTABLISHED
      LIABILITY FOR IED AND EFP ATTACKS and PROPOSED
      FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    A. Agents of Iran organized strikes against U.S. Personnel in Iraq. . . 9

    B. Iran provided material support for the extra-judicial killings
       of U.S. personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

    C. Iran's extra-judicial killings were deliberate. . . . . . . . . . . . . . . . 10

    D. EFP and IED attacks are a deliberate attempt to kill, Iran
       liable for attempted kills. . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    E. Evidence sufficient to establish Jurisdictional causation
       also establishes Iran's liability for the Plaintiff's
       personal injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

II. HABIT AND ROUTINE PRACTICE UNDER FRE R406,
      *KARCHER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  ATTACK ON PLAINTIFF ANSELMO ESPITIA. . . . . . . . . . . . . . 12

IV. *KARCHER* EXPERT REPORTS SHED LIGHT ON IRAN'S
      ACTIONS TO DESTABILIZE IRAQ AND KILL
      U.S. SERVICEMEMBERS. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    F. Expert Report of <u>Kevin Lutz</u> – Iran designed, built, and
       provided IED and EFP materials to insurgent groups in Iraq. .13

    G. Expert Report of <u>Leo Bradley</u> – Iran provided IED components
       to Iraqi insurgents to kill U.S. Servicemembers and
       increase Iran's geopolitical influence. . . . . . . . . . . . . . . . . . .14

H. Expert Report of <u>Donald Barker</u> – Iran supplied weaponry
   to insurgents in Iraq. . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

I. Expert Report of Army Gen. <u>Michael Oates</u> (Ret.) – Iran
   provided funding to armed Shia factions in Iraq, developed
   Special Groups of terrorists trained in Iran, and directed
   insurgents to kill U.S. Servicemembers in Iraq. . . . . . . . . . . 15

J. Expert Report of <u>Michael Pregent</u> – Iran's IRGC provided
   support to insurgents in Iraq. . . . . . . . . . . . . . . . . . . . . . . .16

K. Expert Report of <u>Russell L. McIntyre</u> – Iran funded, trained,
   and equipped Islamic militias and insurgents to destabilize
   Iraq and kill U.S. Servicemembers. . . . . . . . . . . . . . . . . . . .17

V.  DEFENDANT IRAN NEVER DISPUTED LIABILITY IN THE
    INSTANT CASE, FORFEITS ANY AFFIRMATIVE DEFENSES. 19

VI.  ADDITIONAL SOURCES PROVE IRAN'S LIABILITY . . . . . . . . . 21

L. Iranian leaders determined early on to attack U.S. forces in Iraq .21

M. Iranian Revolutionary Guard Corps also organized Insurgent
   groups in Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

N. Iran organized other Special Groups to operate in Iraq as
   Proxy forces against U.S. troops. . . . . . . . . . . . . . . . . . . . . .22

VII. FATALITIES AND INJURIES CAUSED BY IEDS IN IRAQ. . . . . .26

IX. PROPOSED CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . .27

O. Basis of Jurisdiction under FSIA. . . . . . . . . . . . . . . . . . . . . .27

   1. Jurisdiction over Iran and the IRGC is premised
      on 28 USC §§1330(a), 1331, and 1605(A). . . . . . . . . . .27

   2. Service of Process and Personal Jurisdiction . . . . . . . . . . .28

   3. Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . 29

4. Iran Designated a State Sponsor of Terrorism. . . . . . . . . . 30

5. The FSIA Applies to Conduct Occurring Prior to Act's
Enactment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

P. Extrajudicial Killing, Attempted Killing, and Provision of
Material Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1. Extrajudicial Killing and Attempted Extrajudicial Killing. .30

2. Provision of Material Support . . . . . . . . . . . . . . . . . . . . . .32

Q. Federal Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

APPENDIX I – *KARCHER* FINDINGS OF FACT AND CONCLUSIONS
OF LAW

APPENDIX II – *KARCHER* MEMORANDUM OPINION

# TABLE OF AUTHORITIES

*Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989) . . . . . .28

*Bloomfield v. Islamic Republic of Iran,* 1:21-CV-85, USDC, Southern District of TX. . . 8

*Cawley v. State,* 166 Tex.Crim. 37, 310 S.W.2d 340, 342 (1957) . . . . . . . . . . . . . . . . . 19

*Compania Interamericana Exp.-Imp., S.A., v. Compania Dominicana de
    Aviacion,* 88 F.3d 948, 951 (11th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.,* 1 F.3d 374,
    376 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Eriline Co. S.A. v. Johnson,* 440 F.3d 648, 656, 657 (4th Cir. 2006) . . . . . . . . . . . .20, 34

*Flanagan v. Islamic Republic of Iran,* 190 F. Supp. 3d 138, 181 (D.D.C. 2016). . . . 30, 32

*Fritz v. Islamic Republic of Iran,* 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018) . . . . . .33

*Gill v. Islamic Republic of Iran,* 249 F. Supp. 3d 88, 99 (D.D.C. 2017) . . . . . . . . . . . . 31

*Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044,
    1050 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

*Hancock v. AT&T,* 701 F.3d 1248, 1261-62 (10th Cir.2012). . . . . . . . . . . . . . . . . . . 12

*In re Islamic Republic of Iran Terrorism Litig.,* 659 F. Supp. 2d 31,
    43 n.5 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the
    District of Columbia. . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9-11, 12-18, 19, 20, 21, 30

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123,
    1127-28 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Mobil Expl. & Prod'g U.S., Inc. v. Cajun Constr. Servs.,* 45 F.3d 96,
    99-100 (5thCir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Owens v. Republic of Sudan,* 864 F.3d 751, 788 (D.C. Cir. 2017) . . . . . .10, 28, 29, 32, 33

*Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir. 1995) . . . . . . . . . . . . . . .20, 21

*Republic of Austria v. Altmann,* 541 U.S. 677, 692-96 (2004) . . . . . . . . . . . . . . . . 30-31

*Rubin v. Islamic Republic of Iran,* 33 F. Supp.3d 1003, 1006 (N.D. Ill. 2014),
   aff'd, 830 F.3d 470 (7th Cir. 2016), aff'd, 138 S. Ct. 816 (2018) . . . . . . . . . . . 19

*Salinas v. Texas,* 570 U.S. 178, 133 S. Ct. 2174 (2013) . . . . . . . . . . . . . . . . . . . . . . .19, 20

Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) . . . . . . . . . 28

*Tex. v. Allen Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir. 1988) . . . . . . . . . . . . . . . . . .20

*Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984) . . . . . . . . . . . . . .20

*U.S. v. Anderson,* 755 F.3d 782, 794 (5th Cir.2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*USA v. Hovan, et al.,* 2:20-CR-254, Eastern District Pennsylvania . . . . . . . . . . . . .20, 34

*Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1425 (5th Cir. 1992). . . . . . . . . . . 20

## Federal Statutes

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

28 U.S.C. §1330(a)(FSIA, Foreign Sovereign Immunities Act) . . . . . . . . . . . . . 27, 28, 29

28 U.S.C. §1330(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 U.S.C. § 1605A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28, 29, 30, 31, 33

28 U.S.C. § 1605A(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

28 U.S.C. § 1605A(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 28, 33

28 U.S.C. §1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

28 U.S.C. §1608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. §1608(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANSELMO ESPITIA, et. al., | § | |
| | § | **CIVIL ACTION NO. 1:21-CV-123** |
| | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| VS. | § | |
| | § | |
| ISLAMIC REPUBLIC OF IRAN | § | |
| | § | |
| **Defendant** | § | |

## SUPPLEMENTAL BRIEF ON LIABILITY
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE DISTRICT COURT:

**COME NOW**, Plaintiffs and respond to the Court's inquiry. Under the FSIA, the burden of proof is lower than the normal preponderance of evidence standard, because there is a presumption that a state-sponsor of terror will hide documents, witnesses, and attempt to avoid liability for misconduct.[1] The Plaintiffs also ask the Court to take judicial notice of prior precedent in *Karcher v. Iran,* where the court ruled that Iran supplied components and assisted al Qaeda in terror attacks on U.S. servicemembers[2] in Iraq.

Lastly, Plaintiffs will re-emphasize the specific details of the terror attack on Anselmo Espitia. The attacks happened after the war was over and U.S. forces were acting as peacekeepers in Iraq. Mr. Espitia did not encounter IEDs until May, months

---

1 – *See Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the District of Columbia, Memorandum Opinion, *Dkt 95,* issued 8/26/2019).

2 – Serving as peacekeepers in Iraq in support of the Iraqi Provisional Authority.

after the army of Saddam Hussein had been defeated. Plaintiff Espitia also noted that destroyed U.S. vehicles and the bodies of fallen U.S. servicemembers had been booby-trapped with IEDs. This was a hallmark of al Qaeda insurgents in Iraq – set up IEDs around vehicles and bodies to destroy and kill the soldiers that attempted to recover equipment and personnel from the battlefield. Furthermore, Mr. Espitia noted that the IEDs had been deployed with the infrared 'eye' component used in garage doors and that these IEDs were not used by the Iraqi army.

Combining the information from Mr. Espitia and the reports gathered about al Qaeda in Iraq, proves that Defendant Iran was arming al Qaeda insurgents and that Espitita was the victim of Iran's efforts supporting al Qaeda in Iraq. Copious sources have provided information and testified that this was the *habit and routine practice* used by Iran and al Qaeda terrorists to destabilize the government of Iraq and kill U.S. servicemembers. In addition, al Qaeda cells in Iraq boasted about killing U.S. servicemembers.[3] Thereby, Plaintiffs meet the evidentiary standard under 'habit and routine practice' of Rule 406 of the Federal Rules of Evidence. *See* **FRE 406.**

Plaintiffs submit a proposed finding of facts and conclusions of law as follows:

## I. *KARCHER* COURT DETERMINED IRAN LIABLE IN MASS TORT ACTION, BELLWETHER TRIALS ESTABLISHED LIABILITY FOR IED AND EFP ATTACKS and PROPOSED FINDINGS OF FACT

Plaintiffs respectfully ask the Court to take judicial notice of the *Karcher v. Iran* decision and precedent, which found that Iran was responsible for nearly all IED and EFP

_____

3 – *See Bloomfield v. Islamic Republic of Iran,* 1:21-CV-85, USDC, Southern District of TX.

attacks in Iraq. *See Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the District of Columbia. In *Karcher,* the court held three bellwether hearings on the topic of Iran's liability for EFP and IED attacks. After the hearings, the Court ruled that extensive evidence was provided that Iran was responsible for nearly all IED and EFP attacks in Iraq. *Id.* IEDs (improvised explosive devices) and EFPs (explosively formed penetrators) were not part of the capabilities and inventory of Saddam Hussein's Iraqi Army. Rather, the IED and EFP components were smuggled from Iran into Iraq to: 1) kill U.S. servicemembers, 2) destabilize the Iraq Provisional Authority, 3) increase Iran's geopolitical influence in the region. *Id.*

The findings of the *Karcher* Court are as follows:

A.    <u>Agents of Iran organized strikes against U.S. Personnel in Iraq</u>

The *Karcher* Court notes:

"It is clear that the material support for the bellwether EFP strikes and the Karbala attack flowed through the IRGC (Iranian Islamic Revolutionary Guard Corps), specifically its Qods Force, whose leadership included Qasem Soleimani and Abdul Reza Shahlai. Deciding whether the Qods Force, Mr. Soleimani, Mr. Shahlai, or some other Qods Force-affiliated individual was specifically an official, employee, or agent of Iran, however, is unnecessary. The Court is satisfied that the Qods Force is at least an agent of lran."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 70, para 1, lines 8-13, Appx II.

B.    <u>Iran provided material support for the extra-judicial killings of U.S. personnel</u>

The *Karcher* Court continues:

"As to each of the bellwether attacks, Iran provided material support for extrajudicial killing and, in Karbala, hostage taking. Beginning with the EFP strikes, the Court has concluded that Iran, through IRGC-QF and/or Hezbollah, furnished EFPs or the components thereof, facilitated training of Shi'a militia, and supported the militia's effective deployment of this weapon. EFPs were specifically designed to punch through armored vehicles."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 72, para 1, lines 1-6, Appx II.

"Because these weapons deliver deadly force, the Court presumes that Iran's intent was to kill a vehicle's occupants. In other words, the goal was to kill people, not just disable vehicles. Moreover, Iran wanted EFPs to be used against the U.S. military, which Iran saw as a threat to its objectives."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 72, para 1, lines 8-11, Appx II.

C.   <u>Iran's extra-judicial killings were deliberate</u>

"By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate. *See Owens,* 864 F.3d at 770. Iran equipped its proxies for extrajudicial killing that ultimately resulted either in personal injuries or death. The "substantial factor" and "reasonable foreseeability" prongs of the proximate cause analysis are easily satisfied. *Id.* at 794.

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 73, lines 1-6, Appx II.

D.   <u>EFP and IED attacks are a deliberate attempt to kill, Iran liable for attempted kills</u>

"At least several sister courts have found that injuries resulting from "deliberated" attempts to kill fall within the scope of Section 1605A(a)(l). *See id.* (following out-of-circuit authority discussing injuries resulting from "deliberated" attempt to kill (internal quotation marks omitted)); *See Schertzman Cohen v. Islamic Republic of Iran,* Civil Action No. 17-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019)."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 76, lines 3-7, Appx II.

"Deploying an EFP represents a "deliberated" attempt to kill someone. In the alternative to a plain-text reading of Section 1605A(a)(l) that is bolstered by legislative history, the Court concludes that material support or resources to facilitate EFP attacks qualify as material support for attempted extrajudicial killings. Those attempts bring Iran within the terrorist exception to foreign sovereign immunity."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 76, lines 10-14, Appx II.

E.   <u>Evidence sufficient to establish Jurisdictional causation also establishes Iran's liability for the Plaintiff's personal injury</u>

"The Court also determines that Plaintiffs have established their entitlement to

10

relief under 28 U.S.C. § 1605A(c). That provision states that state sponsors of terrorism shall be liable "for personal injury or death caused by acts described in subsection (a)(l) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages," in suits brought by four categories of individuals, including "member[s] of the armed forces" or their legal representatives. 28 U.S.C. § 1605A(c). In other words, this section creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity. Given the overlap between the elements of this cause of action and the terrorism exception, Iran's liability has already been established, as to certain Plaintiffs, by the conclusions of law set forth above. *See, e.g., Allan v. Islamic Republic of Iran,* Civil Case No. 17-338 (RJL), 2019 WL 2185037, at \*6 (D.D.C. May 21, 2019) ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605 A(c) [sic]."); *See Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (Kollar-Kotelly, J.) (discussing overlapping aspects of jurisdiction and liability). Importantly also, Section 1605A(c) creates vicarious liability "for the acts of [Iran's] officials, employees, or agents," in this case, IRGC-QF and its leadership, Hezbollah, and Iraqi proxies."

*Karcher* Memorandum Opinion, dtd 8/26/2019, pg. 76-77, para 2, Appx II.

In the instant case, Plaintiffs respectfully asks the Court to adopt the precedent in *Karcher,* that was based on thousands of pages of testimony – finding that Iran was liable for nearly all IED and EFP attacks on U.S. servicemembers in Iraq, and thus liable to Plaintiffs for damages. Moreover, the instant case meets the same standards under *Karcher:* material support; intent to kill the Plaintiff; deliberated actions; substantial factor and reasonable foreseeability prongs; and jurisdictional causation.

## II. HABIT AND ROUTINE PRACTICE UNDER FRE R406, *KARCHER*

The Plaintiffs ask the Court to apply Federal Rules of Evidence, Rule 406, habit and routine practice to prove that Iran was responsible for the IEDs attack on Anselmo Espitia that led to the Plaintiffs' injuries. The rule notes, "Evidence of a person's habit or

an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." *See* **FRE R 406.**

Appellate courts, including the Fifth Circuit, allow the use of FRE 406 when sufficient evidence is provided. The Fifth Circuit notes, "To offer evidence of a habit, a party must at least demonstrate a regular practice of meeting a particular kind of situation with a specific type of conduct." *See U.S. v. Anderson,* 755 F.3d 782, 794 (5th Cir.2014).

The Fifth Circuit continues, "Habit evidence is relevant to prove that a business acted in a certain way. To obtain a Rule 406 inference of the routine practice of a business, a plaintiff must show a sufficient number of specific instances of conduct to support that inference." *See Mobil Expl. & Prod'g U.S., Inc. v. Cajun Constr. Servs.,* 45 F.3d 96, 99-100 (5th Cir.1995).

The Tenth Circuit notes, "Courts may accept Rule 406 evidence ...as providing an inference that a routine practice was actually carried out. Because business organizations have a profit-driven need for regularity, evidence of their routine practice is particularly persuasive." *See Hancock v. AT&T,* 701 F.3d 1248, 1261-62 (10th Cir.2012).

In the instant case, Plaintiffs ask the Court to apply the Rule 406 inference that it was Iran's *habit and routine practice* to arm, train, and support insurgent groups in Iraq in order to kill U.S. servicemembers in Iraq. For evidence of Iran's habit and routine practice of aiding insurgents, Plaintiffs refer to the *Karcher* ruling and the Expert reports provided in Section IV *supra. See* **Exhibits 10-15.**

### III. ATTACK ON PLAINTIFF ANSELMO ESPITIA

The attack on Plaintiff Anselmo Espitia follows the exact same pattern of a

bellwether attack in the *Karcher* trial. Plaintiff was traveling in a vehicle. Plaintiff exited the vehicle to conduct retrieval operations. Plaintiff was then subjected to multiple IED blasts from hidden areas. At no time was Plaintiff attacked by Iraqi soldiers or elements of Saddam Hussein's Iraqi Army. Instead, Plaintiff was the victim of multiple insurgent attacks where the IEDs were placed by insurgents and hidden – in order to kill or maim unsuspecting U.S. servicemembers. These techniques, using hidden IEDs to kill U.S. servicemembers are the hallmarks of Defendant Iran's strategy to destabilize the Iraqi Provisional Authority and clandestinely kill U.S. servicemembers.

The Plaintiff described his encounters with these IEDS and his injuries. *See* **Exhibit 9.** And the Plaintiff suffered serious injuries from these IED blasts due to Defendant Islamic Republic of Iran's actions.

## IV. *KARCHER* EXPERT REPORTS SHED LIGHT ON IRAN'S ACTIONS TO DESTABILIZE IRAQ AND KILL U.S. SERVICEMEMBERS

To help prove the Plaintiff's case, Plaintiff attaches six expert reports from the *Karcher* decision. The Plaintiff asks the Court to take judicial notice of these reports and the *Karcher* decision.

F. Expert Report of Kevin Lutz –The first report is from Army Col. Kevin Lutz (ret.). Lutz's conclusion was that Iran designed, built, and provided IED and EFP materials to insurgent groups in Iraq. Col. Lutz notes:

> "Given the relative effectiveness of the up-armored (U.S. army) vehicles against roadside IEDs, Iran's IRGC recognized that to inflict significant losses on U.S. military forces it needed to provide its surrogates in Iraq with an armor-defeating capability. Therefore, it introduced precision manufactured and specifically designed EFPs to target and defeat American armor, like Lebanese Hezbollah did when it attacked Israeli Defense Forces armored vehicles in the late 1990s. The

earliest EFP attacks in Iraq likely occurred against U.K. forces in Basra in 2004."

> *See* Col. Lutz Expert Report, **Exhibit 10**, page 6, para 2, lines 4-10.

"Copper EFPs require a great deal of metallurgical and technical precision to manufacture, and thus can only be produced by specific machinery that was largely unavailable to terrorist groups operating in Iraq from 2004 through 2011. The U.S. military traced the machinery used to manufacture most of the EFPs deployed in Iraq to Iran. Iran's IRGC-QF used long-established smuggling routes and trusted Iraqi operatives to smuggle these weapons into Iraq and supply them to Special Groups for use in attacking Coalition Forces."

> *See* Col. Lutz Expert Report, **Exhibit 10**, page 11, para 1.

G. Expert Report of Leo Bradley – The second expert report, written by Army Col. Leo Bradley (ret.) comes to the same conclusion – that Iran built and transported IEDs and EFPs into Iraq to be used against U.S. Forces. Bradley testified that Iran provided IED components to Iraqi insurgents to kill U.S. servicemembers and increase Iran's geopolitical influence. Bradley notes:

"As MNF-I commander General David Petraeus reported to the Secretary of Defense, "Al-Qaida in Iraq extremists continue to act as accelerants for ethno-sectarian violence, and Iranian lethal support to Shi'a militants clearly intensifies the conflict." In short, the Special Groups and other Shi'a militant groups became a critical tool of Iranian foreign policy in its goals for regional dominance."

> *See* Col. Bradley Expert Report, **Exhibit 11**, page 15, para 1, lines 6-10.

"The Iranian Islamic Revolutionary Guard Corps - Qods Force continues to arm, train, and fund illegal armed groups in Iraq. The bulk of weapons used by these groups are made in Iran and supplied by Iran, including mortars, rockets and explosively-formed penetrators (or EFPs). This lethal aid poses a significant threat to Iraqi and multinational forces and to the stability and sovereignty of Iraq. It also undermines the efforts of the Government of Iraq to rebuild the nation."

> See Col. Bradley Expert Report, **Exhibit 11**, page 16, para 1, lines 4-9.

"The intelligence gathering process described above, and in particular the analysis of the EFP's industrial manufacture, was key to identifying them as Iranian. As

U.S. Army Lt. General Rick Zahner stated in a press conference, "[w]hen you talk about devices such as EFPs, that is almost uniquely Iranian: in fact, the fingerprint of the copper plate [liner] being formed in a machine shop. I mean, the pattern [is] so identical that, you know, we can easily identify right there." The Department of Defense summarized the problem thusly: "[Iran has been] supplying some Shi'a extremist groups with explosively formed projectiles (EFPs), the most effective of the roadside bombs."

*See* Col. Bradley Expert Report, **Exhibit 11**, page 23, para 1, lines 1-8.

H. Expert Report of Donald Barker – The expert report of Donald Barker reaches the

same conclusions – Iran supplied IED and EFP components to Iraqi insurgents, to

destabilize Iraq and inflict casualties on U.S. forces. Barker notes:

"In my professional opinion, the Special Groups and other Iranian-backed local Shi'a terror cells could not have deployed and implemented the sophisticated radio-frequency technology necessary to defeat our next-gen ECM system throughout southern Iraq without the active involvement, training, equipment and support of the IRGC (Iranian Islamic Revolutionary Guard Corps)."

*See* Donald Barker Expert Report, **Exhibit 12**, page 16, para 3, lines 6-10.

I. Expert Report of Army Gen. Michael Oates (Ret.) – The expert report of General

Michael Oates reaches the same conclusions. Iran: 1) provided funding to armed Shia

factions in Iraq, 2) developed Special Groups of terrorists trained in Iran, and 3) directed

insurgents to kill U.S. servicemembers in Iraq. Oates states:

"The U.S. military was aware that Iran exerted influence on, and provided substantial funding to, several armed Shi'a factions, including the Badr Corps and JAM but did not prioritize the threat these IRGC-sponsored (Iranian Islamic Revolutionary Guard Corps) groups posed at the time. Recognition of the extent of the threat posed by Iranian-backed groups evolved, based on the growing intelligence gathering, arrests of both local Iraqi militants and IRGC operatives, and physical evidence seized in raids throughout Baghdad and southern and eastern Iraq;

In the second half of 2004, the IRGC and Hezbollah started developing so-called "Special Groups" or "SG" – trained terror cells within JAM and Badr Corps – that

were directly supplied and trained by Hezbollah and the IRGC;

Beginning in 2006, the U.S. military increased its efforts to counter IRGC-sponsored attacks in Iraq and adopted more aggressive measures to target IRGC-sponsored groups;

Following the capture of Qais and Layth Khazali (founding members of Asa'ib Ahl al-Haq a/k/a "AAH" or "The League of the Righteous") and senior Lebanese Hezbollah Commander Ali Musa Daqduq in March 2007 in Basra, the U.S. military assessed that Hezbollah and the IRGC were directing an orchestrated campaign (conducted by their Iraqi surrogates) of violence against U.S. service members and were responsible for hundreds of attacks, including nearly all EFP and IRAM attacks, and that they posed a greater threat to stability in Iraq than AQI or other Sunni terror groups; and

Later intelligence reports, detainee interrogations, weapons cache discoveries and experience with IRGC "ratlines" for smuggling munitions from Iran to Iraq – all confirmed the central role the IRGC and Hezbollah played in devising and supporting lethal attacks on U.S. service members in Iraq."

    *See* Michael Oates Expert Report, **Exhibit 13**, page 4, para 1, items 3-7.

J. <u>Expert Report of Michael Pregent</u> – The expert report of Michael Pregent, a former

U.S. Army Intelligence Officer and current geopolitical expert on the Middle East,

reaches the same conclusion. Iran provided support to the insurgency in Iraq, via Iran's

Islamic Revolutionary Guard Corps (IRGC) and Iran's goal was to kill U.S.

servicemembers in Iraq via a proxy war. Pregent notes:

"Iran's primary instrument for exporting the ideology of the Islamic Revolution is the IRGC. Answering directly to the Supreme Leader, Ali Khamenei, it is tasked with preserving the Islamic Republic of Iran and at the same time is Iran's main link to its terrorist proxies. The IRGC was first designated by the Treasury department pursuant to Executive Order 13382 on October 25, 2007. It was further designated a Specially Designated Global Terrorist ("SDGT") in October 2017. In 1990, the IRGC transferred certain capabilities to its Qods Force subdivision ("IRGCQF"). The IRGC-QF is a special unit responsible for extraterritorial operations. It specializes in foreign missions and providing weapons, training and funding to terrorist groups including Iraqi insurgents, Hezbollah and Hamas. Commanded by Major General Qasem Soleimani, the IRGCQF reports directly to Iran's Supreme Leader."

*See* Michael Pregent Expert Report, **Exhibit 14**, pages 7-8, para 3.

"In August 2004, Sadr agreed to form what were called "Special Groups", semi-autonomous special forces units consisting of the most able and ideologically committed JAM operatives and led by Sadr's most senior and capable commanders. These commanders included Qais Khazali and Akram Kaabi, who developed direct channels of communication with the IRGC-QF and Hezbollah. These Special Groups received advanced training and weapons from Hezbollah and the IRGC (Iranian Islamic Revolutionary Guard Corps)."

*See* Michael Pregent Expert Report, **Exhibit 14**, page 10, para 2.

"As noted above, both the IRGC-QF and Hezbollah were heavily involved in identifying talent, recruiting, and training Special Groups, whose members mostly hailed from the predominantly Shi'a towns of southern Iraq and Shi'a enclaves in Baghdad, such as the infamous slum in east Baghdad locally referred to as Sadr City. Numerous Iraqi trainees captured by Coalition Forces in Iraq described traveling to Iran, where they were taken to military training compounds manned by uniformed Iranian soldiers. These camps were run by the IRGC-QF, and the trainers were all either members of the IRGC-QF or Hezbollah."

*See* Michael Pregent Expert Report, **Exhibit 14**, page 11, para 1.

K. Expert Report of Russell L. McIntyre – Russell McIntyre, who was the Chief of the

Office of Forensic Intelligence, Directorate for Science & Technology at the Defense

Intelligence Agency, reached the same conclusion. Iran funded, trained, and equipped

Islamic militias and insurgents to destabilize Iraq and kill U.S. servicemembers. Mr.

McIntyre notes:

"There are published reports that the IRGC (Iranian Islamic Revolutionary Guard Corps) dispatched two senior Hezbollah operatives with particularly close ties to the IRGC to Iraq to help organize and birth the creation of "Jaysh al-Mahdi" or "JAM" – the Sadrist movement's armed faction – in 2003. From 2003 to 2006, the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq, supplemented with logistical support from the IRGC-directed "Sheibani network" consisting of "former" Badr Corps operatives."

*See* Russell McIntyre Expert Report, **Exhibit 15**, page 16, para 1.

"General George Casey, then Commander of MNF-I, outlined the support that Iran and Hezbollah were providing to Shi'a groups in Iraq: "We are quite confident that the Iranians, through their covert special operations forces, are providing weapons, IED technology and training to Shia extremist groups in Iraq. Some training is being carried out in Iran. In other cases, Hezbollah, the Lebanon-based terrorist group, is providing weapons and training at Iran's behest.""

 *See* Russell McIntyre Expert Report, **Exhibit 15**, page 17, para 1.

"In the past six months we have also targeted Shia militia extremists, capturing a number of senior leaders and fighters, as well as the deputy commander of Lebanese Hezbollah Department 2800, the organization created to support the training, arming, funding, and, in some cases, direction of the militia extremists by the Iranian Revolutionary Guard Corps' Qods Force. These elements have assassinated and kidnapped Iraqi governmental leaders, killed and wounded our soldiers with advanced explosive devices provided by Iran, and indiscriminately rocketed civilians in the International Zone and elsewhere. It is increasingly apparent to both Coalition and Iraqi leaders that Iran, through the use of the Qods Force, seeks to turn the Iraqi Special Groups into a Hezbollah-like force to serve its interests and fight a proxy war against the Iraqi state and coalition forces in Iraq."

 *See* Russell McIntyre Expert Report, **Exhibit 15**, page 17, sub para 1.

 The expert reports provided in *Karcher,* of Lutz, Bradley, Barker, Oates, Pregent, and McIntyre reach the same conclusion. Iran was actively engaged in arming insurgents and militias in Iraq (starting from 2003) with IEDs, EFPs, and other weaponry in order to kill and injure U.S. servicemembers serving in Iraq.

 Plaintiffs ask the Court for the Rule 406 inference of *habit and routine practice* – that it was the habit and routine practice of Iran to train and arm insurgents to kill U.S. servicemembers in Iraq and destabilize the Iraq provisional authority. *See* FRCP R406. Therefore, based on these reports, Iran is liable for the Plaintiffs' injuries.

## V. DEFENDANT IRAN NEVER DISPUTED LIABILITY
## IN THE INSTANT CASE, FORFEITS ANY AFFIRMATIVE DEFENSES

Iran will make appearances in U.S. District Court. *See Rubin v. Islamic Republic of Iran,* 33 F. Supp.3d 1003, 1006 (N.D. Ill. 2014), aff'd, 830 F.3d 470 (7th Cir. 2016), aff'd, 138 S. Ct. 816 (2018); *see also In re Islamic Republic of Iran Terrorism Litig.,* 659 F. Supp. 2d 31, 43 n.5 (D.D.C. 2009)(noting that Iran is "an experienced litigant in the United States Federal Court System generally and in this Circuit"). In the *Rubin* and *In re Islamic Republic of Iran cases,* Iran argued that it should not be held liable for its acts of terror. So, the Defendant does recognize the authority of District Courts of the United States and will make appearances to argue its position.

In the instant case, Iran was served a copy of the lawsuit and was sent copies of briefs, motions, and filings. Yet, Iran purposely chose not to appear and not to dispute the allegations. Why? Because Iran knows it is guilty of supporting terrorism and liable for the Plaintiffs' injuries. *See Cawley v. State,* 166 Tex.Crim. 37, 310 S.W.2d 340, 342 (1957)(Unexplained flight has long been deemed indicative of consciousness of guilt.); *see also Salinas v. Texas,* 570 U.S. 178, 133 S. Ct. 2174 (2013)(A defendant's silence may be used as an inference of guilt.)

Plaintiff argues a cause of action with copious proof, expert reports, intelligence assessments, and records of Iranian officials explaining the regime's reasons for attacking U.S. servicemembers in Iraq. And instead of providing a basic defense, the Defendant chose not to appear in the instant case because Iran knows it is liable for the Plaintiffs' injuries.

Plaintiffs ask the Court to follow the *Karcher* precedent and award a default judgment. *See Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the District

of Columbia; *see also Compania Interamericana Exp.-Imp., S.A., v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir.1996)(The plaintiff must provide sufficient evidence in support of its claim and the court must consider the evidence before default can be entered.) By not defending the instant case, Defendant Iran's actions lead to a reasonable conclusion that it is aware of its misconduct and liable for Plaintiffs' injuries. *See Salinas v. Texas,* 570 U.S. 178, 133 S. Ct. 2174 (2013)(A defendant's silence may be used as an inference of guilt.)

Furthermore, by not making an appearance in the instant case, Defendant has forfeited all affirmative defenses, including *statute of limitations.* In the instant case, it is up to the Defendant to raise a statute of limitations defense. *See Karcher,* Findings of Fact & Conclusions of Law, dkt 80 (issued 3/20/2019). *See also Eriline Co. S.A. v. Johnson,* 440 F.3d 648, 656, 657 (4th Cir. 2006)(At least absent "narrow circumstances," a "district court should . . . refrain[] from raising and considering the statute of limitations defense *sua sponte,"* and "failure to do so constitutes an error of law.").

Iran also availed itself to the laws of the State of Texas, and precedent, when it engaged in a scheme with Texas residents to violate the oil embargo in 2020. *See USA v. Hovan, et al.,* 2:20-CR-254, Eastern District Pennsylvania. Iran tolled the applicable statute of limitations because it engaged in *fraudulent concealment.* Iran hid the details of its funding of Iraqi insurgents, support of al Qaeda, and harboring of al Qaeda leaders. Thus, any statute of limitations regarding the instant case is tolled. *See Tex. v. Allen Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir. 1988); *see also Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984); *Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir. 1995); *Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.,* 1 F.3d 374, 376 (5th Cir. 1993); *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1425 (5th

Cir. 1992).

Extensive evidence was given of Iran's efforts to clandestinely support Iraqi insurgents. *See* Sections I, IV, *supra. Therefore,* Plaintiff asks the Court to apply the *fraudulent concealment doctrine* and toll any applicable statute of limitations for the instant case. *See Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir. 1995).

In addition, it was not determined until 2020, that Iran was hiding and harboring top al Qaeda leadership in its capital city Tehran. On August 7, 2020, Abu Muhammad al-Masri, the second-in-command of al Qaeda was killed in Tehran. Al-Masri had been **secretly** living in Tehran, under the protection of the Defendant for years. *See* **Exhibit 6.** Thereby, since Iran did not disclose its support, housing, and provision of top al Qaeda leadership until August 7, 2020 – the statute of limitations for Mr. Espitia's injuries was tolled and did not start until August 7, 2020 under the *fraudulent concealment* doctrine.

The instant case was filed within two years of the new statute of limitations start date of August 7, 2020. Thereby, the instant case was timely filed. Furthermore, Defendant Islamic Republic of Iran chose not to appear in the instant case and <u>did not raise</u> the affirmative defense of statute of limitations.

## VI. ADDITIONAL SOURCES PROVE IRAN'S LIABILITY

Other sources also concur and bolster the conclusion reached in the *Karcher* case. These sources show that Iran is liable for the attack on Plaintiff Anselmo Espitia.

L.  <u>Iranian Leaders determined early on to attack U.S. forces in Iraq</u>

> "Supreme Leader Ayatollah Ali Khamenei convened a council of war in Tehran in 2002 that concluded: "It is necessary to adopt an active policy in order to prevent long-term and short-term dangers to Iran." As a result, Iranian intelligence services organized the various Iraqi resistance groups they had been sheltering under Brigadier General Qassim Sullaimani, the current head of the

Quds Force."

> *See* Michael Ware, "Inside Iran's Secret War for Iraq," Time, August 15 2005, available at www.time.com/time/ magazine/article/0.9171. 1093747.00.html (accessed February 3, 2008).

"In a sermon on May 2 [2003], Ayatollah Ahmad Jannati, secretary general of Iran's powerful Council of Guardians, called on Iraqis to stage suicide attacks to drive U.S.-led forces from [Iraq]. . . Two months later . . . coalition forces uncovered a document describing a fatwa, or religious edict, that had reportedly been issued in Iran for its Shiite supporters in Iraq. The fatwa urged "holy fighters" in Iraq to get close to the enemy—the U.S.-led troops. These fighters, the fatwa said, should "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."

> *See* Edward T. Pound, "Special Report: The Iran Connection," U.S. News & World Report, November 14, 2004, available at www.usnews.com/usnews/news/articles/041122/22iran.htm (accessed January 31, 2008).

M.  <u>Iranian Revolutionary Guard Corps also organized Insurgent Groups in Iraq</u>

"By August 2005, Abu Mustafa al-Sheibani had developed an extensive "network of insurgents created by the Iranian Revolutionary Guard Corps with the express purpose of committing violence against U.S. and coalition forces in Iraq.""

"Sheibani's group introduced into Iraq "'shaped' explosive charges"— used to target U.S. military armored vehicles—based on a model used by Hezbollah against the Israelis, and its fighters trained in Lebanon as well as Sadr City and "another country," according to U.S. intelligence sources."

"An American military official in Baghdad explained that "the U.S. believes that Iran has brokered a partnership between Iraqi Shiite militants and Hezbollah and facilitated the import of sophisticated weapons that are killing and wounding U.S. and British troops.""

> *See* Kagan, Frederick, "Iranian Influence in the Levant, Iraq, and Afghanistan," American Enterprise Institute, **Exhibit 16**; *See also* Michael Ware, "Inside Iran's Secret War for Iraq." Time, August 15 2005, available at www.time.com/time/magazine /article/0.9171.1093747.00.html (accessed February 3, 2008).

N. Iran Organized other Special Groups to Operate in Iraq as Proxy Forces against U.S.
   Troops

"The Iranians preferred not to be directly implicated in attacks on U.S.
forces but instead offered bounties to Iraqis for killing Americans,
shooting down U.S. helicopters, and destroying American tanks."

See Edward T. Pound, "Special Report: The Iran Connection,"
U.S. News & World Report, November 14, 2004, available at
www.usnews.com/usnews/news/articles/041122/22iran.htm
(accessed January 31, 2008).

"In October 2005, a British government official "alleged that Iran had
supplied explosive devices to Sadr's Mahdi Army."20 Prime Minister
Tony Blair subsequently supported that assertion and "attributed the
shipments to Iranian elements."

See Kenneth Katzman, Iran's Influence in Iraq, Congressional
Research Service, November 15, 2005, available at
http://assets.opencrs.com/rpts/RS22323_20051115.pdf
(accessed February 5, 2008).

"The number and quality of special groups increased in 2005 as the
Iranian government allowed Hezbollah to train Iraqi militias in Iran. The
three small camps used for training Iraqi militias were, as of summer
2007, located near Tehran. Twenty to sixty Iraqis can be trained at once in
these facilities, and the training courses last from four to six weeks."

See Babak Dehghanpisheh, "Iraq's New Guns for Hire,"
Newsweek, May 7, 2007.

"In 2005 and 2006, the Quds Force's "goal was to develop the Iraqi
special groups into a network similar to the Lebanese Hezbollah. Special
groups would be unable to conduct their terrorist attacks in Iraq without
Iranian supplied weapons and other support," according to a U.S. military
spokesman. The purpose of the Quds force effort, then, was to create a
highly lethal network that relied upon the Iranian government to survive.
Presumably, this reorganization would increase Tehran's ability to control
and influence operations in Iraq."

See Brigadier General Kevin Bergner (press briefing,
Combined Press Information Center, Baghdad, Iraq, July 2,
2007) available at www.mnf-iraq.com/index.php?option=

com_content&task=view&id=12641&Itemid=131
(accessed February 3, 2008).

"There are Iranian operatives in Iraq assisting the special groups.
Iranians tied to the Quds Force operated in Iraq at the end of 2006 and the
beginning of 2007. U.S. Special Forces detained Mohsin Chizari, the
third ranking official in the Quds Force, at the Baghdad compound of Abd
al-Aziz al-Hakim on December 29, 2006. He and his captured colleague
had detailed weapons lists, documents pertaining to shipments of weapons
into Iraq, organizational charts, telephone records and maps, among other
sensitive intelligence information. Officials were particularly concerned
by the fact that the Iranians had information about importing modern,
specially shaped explosive charges into Iraq, weapons that have been used
in roadside bombs to target U.S. military armored vehicles."

> *See* Sudarsan Raghavan and Robin Wright, "Iraq Expels
> 2 Iranians Detained by U.S.," Washington Post, December
> 30, 2006.

"IRGC surrogates, people that have been trained by the IRGC in Iran
who've come back in Iraq to conduct acts of violence." In addition,
he said, "I believe I got some members of the IRGC, some Iranians, who
are working in our battlespace." He believes that there were about twenty
Iranian IRGC advisers "either training Iraqis to conduct acts of violence or
conducting those acts of violence themselves. . . . And what they do is
they transit the battlespace. They don't come in and they stay, but they're
going back and forth."

> *See* Major General Rick Lynch (Department of Defense
> news briefing on Operation Marne Husky, Arlington, VA,
> August 24, 2007), available at www.defenselink.mil/
> transcripts/transcript.aspx?transcriptid=4028 (accessed
> February 3, 2008).

"Another British intelligence source "said that Iranian government
agencies were also secretly helping Ansar al-Islam members cross into
Iraq from Iran, as part of a plan to mount sniper attacks against coalition
forces."53 American sources confirmed this information, adding that "an
Iranian was aiding Ansar al-Islam 'on how to build and set up' . . . IEDs.
An analyst for the U.S. Central Command offered this assessment: '[Ansar
al-Islam] is actively attempting to improve IED effectiveness and
sophistication.'"

> *See* Edward T. Pound, "Special Report: The Iran Connection,"

24

U.S. News & World Report, November 14, 2004, available at www.usnews.com/usnews/news/articles/041122/22iran.htm (accessed January 31, 2008).

"In June and July 2007, U.S. forces conducted targeted raids on insurgent safe houses in Arab Jabour during Operation Marne Torch, discovering caches of new weapons with Iranian markings. The weapons had been imported recently rather than buried or stockpiled. Weapons were being stored in Arab Jabour, indicating that it was a way station of sorts."

See Major General Rick Lynch (Department of Defense news briefing on Operation Marne Husky, Arlington, VA, August 24, 2007), available at www.defenselink.mil/ transcripts/transcript.aspx?transcriptid=4028 (accessed February 3, 2008).

"U.S. forces captured Qais Khazali, Laith Khazali, and Daqduq in a single operation on March 20, 2007, in Basra, Iraq's southernmost city. The three obviously worked together on occasion. U.S. forces also confiscated a computer, false identification cards, and diaries in the raid. From these documents and separate interviews, U.S. forces confirmed that Qais Khazali, Laith Khazali, and Daqduq were leaders of a network deliberately developed by the Iranian government to foment violence in Iraq. The U.S. military spokesman in Baghdad released a file early in July reproducing some of these documents."

See Brigadier General Kevin Bergner (press briefing), slide 4, available at www.mnf-iraq.com/images/stories/ Press_ briefings/2007/ 070702_briefing_slides.pdf (accessed February 3, 2008).

"In addition, earlier in 2007, American troops discovered over one hundred Austrian-made Steyr HS50 .50 caliber sniper rifles in Iraq.98 These high-powered sniper rifles, which fire Iranian rounds, "can pierce all body armor from up to a mile and penetrate armored Humvee troop carriers."99 The rifles were part of a larger shipment legally purchased from the Austrian manufacturer by Iran a year before under the justification that they would be used by the Iranian police to combat drug smugglers. The presence of these weapons shows a high level of sophistication in the Iranian arms flow into Iraq, as the purchase was made officially by the Iranian government."

See Thomas Harding, "Iraqi Insurgents Using Austrian Rifles from Iran," Daily Telegraph, February 13, 2007.

The reports and evidence provided all come to the same conclusion – Iran was actively supporting and engaging in activities to kill U.S. servicemembers in Iraq via the use of IEDs and EFPs. Iran attempted to hide its activities, however multiple reports and evidence trails conclusively show that Iran was acting as a State Sponsor of Terror that targeted U.S. servicemembers in Iraq, including the Plaintiff. Iran expended funds to kill U.S. servicemembers. Iran's actions led to the deaths and injuries of thousands of U.S. troops supporting the peacekeeping mission in Iraq. And Iran's weapons-of-choice were IEDs and EFPs. Thus, Iran is liable for Plaintiffs' injuries.

## VII. FATALITIES AND INJURIES CAUSED BY IEDS IN IRAQ

Other statistical reports show the numbers of U.S. casualties caused by IEDs and EFPs in Iraq. These figures demonstrate that the Iranian *habit and routine practice* of supplying IED and EFP components to insurgents caused devastating losses to U.S. forces in Iraq.

The IED and EFP attacks were not a mistake and were not one-offs. Instead, the attacks were part of a calculated Iranian strategy to murder U.S. troops and cause the withdrawal of U.S. forces in the region.

**U.S. MILITARY FATALITIES CAUSED BY IMPROVISED EXPLOSIVE DEVICES**[44]



**ADDITIONAL STATISTICS CONCERNING IED'S**[45]:

*The Army reports that IED's are responsible for 80% of all soldier casualties (deaths and injuries)

*Despite the enemy deploying twice as many IED's as a year ago, casualties have remained steady, with less then 10% causing casualties

*This is because U.S. troops are now detecting and successfully disarming approximately 50% of IED's

*The Pentagon is requesting an additional $6.4 billion for its Joint Improvised Explosive Device Defeat Organization (JIEDDO)

*Explosively Formed Projectiles (EFP's), the most lethal type of IED, make up only 2% of all IED's found in Iraq but account for a "very large percentage" of U.S. soldiers killed by IED's, according to Col. Barry Shoop, chief scientist for the JIEDDO

> *See* Rowan Scarborough, "Enemy Doubles IED Use in Iraq", Washington Times, February 7, 2007, p. 5. "Almost Half of IEDs in Iraq Defused by GIs", Aerospace Daily & Defense Report, February 5, 2007.

## IX. PROPOSED CONCLUSIONS OF LAW

O. <u>Basis of Jurisdiction under FSIA</u>

    1. <u>Jurisdiction over Iran and the IRGC is premised on 28 USC §§1330(a), 1331, and 1605(A)</u>.

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in

the United States. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions in which a federal district court can obtain personal and subject matter jurisdiction over a foreign state. *See e.g., Owens,* 826 F. Supp. 2d at 148, aff'd, *Owens v. Republic of Sudan,* 864 F.3d 751 (D.C. Cir. 2017). Under the FSIA, a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a), 1604.

The "Terrorism Exception" to the FSIA, first enacted as part of the Mandatory Victim's Restitution Act of 1996 and substantially expanded by section 1083 of the National Defense Authorization Act for Fiscal Year 2008, authorizes causes of action against foreign state sponsors of terrorism for "personal injury or death" arising from acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support for those acts. 28 U.S.C. § 1605A(c). In the case at bar, the Court has jurisdiction because service was proper and Defendant's conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A.

### 2. Service of Process and Personal Jurisdiction

Under the FSIA, a court may exercise personal jurisdiction over a defendant if the state is properly served in accordance with 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b); *Stern,* 271 F. Supp. 2d at 298. In the instant case, the District Clerk and Court issued an 'Entry of Default' against Defendant Islamic Republic of Iran on 11/29/2021. *See Dkt 9.*

Iran was served with the summons and complaint, yet simply chose not to answer the lawsuit. Thus, service was accomplished.

### 3. Subject Matter Jurisdiction

Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. See 28 U.S.C. §§ 1330(a), 1604. Here, Defendant's conduct falls within the "state sponsor of terrorism" exception set forth at 28 U.S.C. § 1605A:

> "A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." See 28 U.S.C. § 1605A(a)(1).

To bring a suit in such a case, the foreign state defendant must have been designated by the U.S. Department of State as a "state sponsor of terrorism" at the time the act complained of occurred. *Id; Owens,* 826 F. Supp. 2d at 148-149. Moreover, subsection 28 U.S.C. § 1605A(a)(2)(A)(ii) requires that the "claimant or the victim was, at the time the act . . . occurred—(I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment." *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III).

Plaintiffs meet each of the requirements for subject matter jurisdiction. Iran was designated as a State Sponsor of Terrorism at the time of the attack on Mr. Espitia. Plaintiffs' injuries were caused by Defendant Iran's acts of attempted extrajudicial killing

and provision of material support for such acts to their agents. Lastly, Plaintiffs have presented evidence that Anselmo Espitia was a U.S. national and a member of the U.S. armed services at the time of the attack.

Federal caselaw also notes that immediate family members of a victim of a terror attack also have FSIA claims. *See Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the District of Columbia, Memorandum Opinion, *Dkt 95,* issued 8/26/2019). In addition, the *Owens* Court notes, "In sum, by its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant [Kenyan or Tanzanian family members] who is not the legal representative of a victim physically injured by a terrorist attack." *See Owens,* 864 F.3d at 807. In the instant case, the additional plaintiffs are all immediate family members of Plaintiff Sean White.

### 4. Iran Designated a State Sponsor of Terrorism

Section 1605A applies only to SSTs, which it defines as "a country the government of which the Secretary of State has determined ... is a government that has repeatedly provided support for acts of international terrorism." 28 U.S.C. § 1605A(h)(6). Iran was a designated State Sponsor of Terrorism on January 19, 1984 (before the attack on Plaintiff Anselmo Espitia) and has remained so ever since without interruption.

### 5. The FSIA Applies to Conduct Occurring Prior to Act's Enactment

The Terrorism Exception unequivocally applies to conduct, like Defendant's wrongdoing, that occurred prior to its enactment and the enactment of amendments to the Act. *See, e.g., Republic of Austria v. Altmann,* 541 U.S. 677, 692-96 (2004); *Flanagan v. Islamic Republic of Iran,* 190 F. Supp. 3d 138, 181 (D.D.C. 2016). The Supreme Court in

*Republic of Austria* held that the FSIA applies to pre-enactment conduct by foreign states, explaining: "we find clear evidence that Congress intended the Act to apply to pre-enactment conduct." *Republic of Austria v. Altmann,* 541 U.S. at 697. Courts in this Circuit have similarly held that section 1605A applies to conduct predating its 2008 enactment.

P. Extrajudicial Killing, Attempted Killing, and Provision of Material Support

1. Extrajudicial Killing and Attempted Extrajudicial Killing

The definition of "extrajudicial killing," at section 1605A(h) follows the definition set forth in the Torture Victims Protection Act of 1991. See 28 U.S.C. § 1605A(h)(7). "Extrajudicial killing" is defined as: [1] "a deliberated killing [2] not authorized by a previous judgment pronounced by a regularly constituted court [3] affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and [4] that, "under international law," is not "lawfully carried out under the authority of a foreign nation." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7). *See Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1050 (D.C. Cir. 2014) ("With respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

As other courts have held, the term "extrajudicial killing" encompasses attempted extrajudicial killings. *Gill v. Islamic Republic of Iran,* 249 F. Supp. 3d 88, 99 (D.D.C. 2017)(holding that a terrorist group's "attempted extrajudicial killing of the plaintiff constitutes an extrajudicial killing under the terrorism exception."). Moreover, where a killing has occurred, "[i]t is not necessary . . .for one of the plaintiffs [themselves] to have

died in the attack in order for the state-sponsor-of terrorism exception to apply." *Id.* (quoting *Cohen v. Islamic Republic of Iran,* 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

The instant case involves the attempted extra-judicial killing of Plaintiff Anselmo Espitia. Plaintiffs provide evidence that IED and EFPs were designed to kill U.S. servicemembers. Plaintiffs also provide evidence that Iran's goal, and the goal of its proxy forces, special groups, and agents were to kill U.S. servicemembers in Iraq. Lastly, Plaintiff Espitia provided evidence that the attacks occurred months after the defeat of Saddam Hussein's Iraqi Army and the IEDs were hidden from view, in order to maximize damage and kill Mr. Espitia. *See* **Exhibit 9.**

### 2. Provision of Material Support

Plaintiffs have satisfied their burden under 28 U.S.C. § 1608(e) to show that Iran, through Hezbollah, the IRGC and the IRGC-QF, provided vast amounts of material support and resources to Iran's terror proxies in Iraq that carried out the attacks at issue at Iran's behest. The definition of "material support or resources" in section 1605A is drawn from the Anti-Terrorism Act, 18 U.S.C. § 2339A, and is defined as:

> "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."

The FSIA requires that the extrajudicial killings, torture, and hostage taking be "caused by" the provision of material support. In the FSIA context, the causation requirement is satisfied by a showing of proximate cause. *See e.g., Flanagan,* 190 F. Supp. 3d at 177 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d

1123, 1127-28 (D.C. Cir. 2004)). "Proximate causation normally requires only that there be 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id.* (citing Prosser & Keeton on the Law of Torts 263 (5th ed. 1984); as cited in *Kilburn,* 376 F.3d at 1128.

Neither specific intent nor advanced knowledge by the foreign state of a terrorist act is required for a finding that a state sponsor of terrorism provided "material support" under the FSIA's terrorist exception. In *Owens v. Republic of Sudan,* the D.C. Circuit explicitly rejected the argument that the FSIA requires a "greater showing of intent than proximate cause." *Owens,* 864 F.3d at 798.

As noted in this brief, Iran provided material support and resources to Hezbollah and each of its Iraqi proxies in the form of financial support, training, weapons, intelligence, and safe harbor. This qualifies as property, currency, financial services, lodging, training, expert advice and assistance, safehouses, weapons and explosives under 18 U.S.C. § 2339A.

Q. Federal Cause of Action

Section 1605A(c) creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person. Plaintiff Sean White was a U.S. national and a military servicemember at the time of the attack. The remaining Plaintiffs are immediate family members of White, thus each has a valid claim under the FSIA. *See Fritz,* 320 F. Supp. 3d at 90 (applying D.C. law to non-citizen plaintiff's claim where plaintiff was related to a U.S. service member killed by Iranian-backed terrorists); *see also Owens,* 826 F. Supp. 2d at 155 (applying D.C. law to foreign

national family members of victims of terrorist attacks).

In addition, Defendant Iran availed itself of the laws of the State of Texas by conspiring with Texas residents in 2020 to violate the oil embargo. *See USA v. Hovan, et al.,* 2:20-CR-254, Eastern District Pennsylvania. Thus, Plaintiffs ask the Court to apply the *fraudulent concealment doctrine* and toll the statute of limitations – due to Iran's continued efforts to hide, destroy, and withhold evidence regarding its support and provision of insurgents in Iraq. Moreover, al Qaeda's second-in-command, Abu Muhammad al-Masri, was living in Tehran, Iran with the support and help of the Defendant. This information was unknown until August 7, 2020 – when al-Masri was killed in Tehran. *See* **Exhibit 6.** Thus, the beginning of any statute of limitations was tolled until August 7, 2020 when it was <u>finally proven</u> that Defendant Islamic Republic of Iran fully supported al Qaeda and employed al Qaeda as a proxy force in Iraq.

Lastly, Iran did not appear in the instant case and forfeits any and all affirmative defenses – including statute of limitations, that can only be raised by the Defendant and not *sua sponte* by the Court. *See Eriline Co. S.A. v. Johnson,* 440 F.3d 648, 656, 657 (4th Cir. 2006).

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the District Court grant the Motion for Default Judgment in its entirety.

DATED:  MARCH 1, 2022               Respectfully submitted,

By:     /s/ R. Bruce Tharpe
        R. Bruce Tharpe

34

**LAW OFFICE OF
R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

ATTORNEY OF RECORD FOR
 PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I, R. BRUCE THARPE, do hereby certify that on March 1, 2022, this Motion was served on all parties of record via the SDTX_USDC electronic case filing system. Additionally, a copy of this filing was mailed to the Defendant at the Foreign Ministry of Iran, Imam Kkomeni St, Imam Khomeni Sq, Tehran, Iran 11369114811 via Canada Post.

<u>/s/ R. Bruce Tharpe</u>
R. BRUCE THARPE,
ATTORNEY OF RECORD FOR
 PLAINTIFFS