United States District Court
Southern District of Texas
**ENTERED**
June 16, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ANSELMO ESPITIA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:21-CV-123 |
| | § | |
| ISLAMIC REPUBLIC OF IRAN, | § | |
| | § | |
| Defendant. | § | |

## ORDER AND OPINION

Between May and June 2003, Anselmo Espitia served on active duty in Iraq with the United States Army. While he was serving as a combat engineer and construction equipment repairer, al Qaeda operatives detonated multiple explosives near him in a series of attacks, causing Espitia to suffer severe and permanent injuries.

Espitia and several of his family members ("Plaintiffs") filed this action against the Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, alleging that Iran is liable for the injuries caused by the attack because of the state's material support of al Qaeda's terrorist activity in Iraq.

After Plaintiffs perfected service under the Hague Convention, Iran failed to file a responsive pleading. The Clerk of Court entered default, and the Court set a deadline for Plaintiffs to submit evidence in support of a motion for default judgment. They have done so. (Motion, Doc. 12) Based on the record and the applicable law, the Court finds that Plaintiffs have provided satisfactory evidence to support default judgment.

I.  **Factual Findings**[1]

   A. **Evidentiary Standard**

Federal Rule of Civil Procedure 55 governs the entry of default judgment, which represents a "drastic remedy" available only where "the adversary process has been halted because of an essentially unresponsive party." *Sun Bank of Ocala v. Pelican Homestead and Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (citations omitted). The district court in its discretion determines whether a default judgment is appropriate. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

Under the Foreign Sovereign Immunities Act ("FSIA"), "[n]o judgment by default shall be entered by a court . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide", and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)); *see also Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (citations omitted) ("A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true.").[2] A court may not "simply accept a complaint's unsupported allegations as true"; the plaintiff must provide some form of evidentiary support. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citations omitted). Plaintiffs may satisfy their burden of production through the submission of documentary evidence, such as detailed affidavits or

---

[1] The Court bases its factual findings on the evidence that Plaintiffs submit and of which the Court can take judicial notice.

[2] The Fifth Circuit does not appear to have considered a matter under the state-sponsored-terrorism exception within the FSIA. The absence of such caselaw stems, at least in part, from the venue provision within 28 U.S.C. § 1391(f) for actions against foreign states. Under that provision, most lawsuits under Section 1605A would typically fall within Section 1391(f)(4), which provides for venue in the United States District Court for the District of Columbia. Accordingly, that judicial district provides most of the caselaw regarding the state-sponsored terrorism exception. But Section 1391(f) is permissive and not exclusive—i.e., a state action "may be brought" in four defined venues—and here, venue is proper in the Southern District of Texas, Brownsville Division. Given the absence of Fifth Circuit authority on this issue, the Court looks to the decisions from the District of Columbia as persuasive authority.

declarations describing the nature and extent of their damages. *Id.* (accepting uncontroverted evidence in the form of affidavits as true); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011). Additionally, a court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence", although the court must "reach [its] own, independent findings of fact." *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010)).

In the current matter, Plaintiffs submitted nine exhibits with their Motion, including two United States Department of State annual reports from 2010 and 2019, news articles detailing Iran's connection to al Qaeda's terrorist operations, a brief by United Against Nuclear Iran, as well a declaration by Anselmo Espitia. Following a Court Order finding this evidence insufficient, Plaintiffs submitted a Supplement to the Motion with seven additional exhibits, including six expert reports from *Karcher* and one report by the American Enterprise Institute. (Doc. 13)

**B. Iran's Support of Terrorism in Iraq**

Since 1984, the United States Department of State has designated Iran as a state sponsor of terrorism. (State Dep't Country Reports on Terrorism 2010, Doc. 12-3, 3) The State Department labels Iran as "the world's worst state sponsor of terrorism", based on the Iranian regime's extensive support of various terrorist organizations, including al Qaeda, that are hostile to the United States and its allies. (State Dep't Country Report on Terrorism 2019, Doc. 12-1, 4) The United States has confirmed that the Iranian Ministry of Intelligence and Security ("MOIS") "provided money and weapons to [al Qaeda] in Iraq", as well as facilitated the organization's operations in Iraq through the provision of travel documents. (United Against Nuclear Iran Brief, Doc. 12-5, 11) Iran's material support of al Qaeda's operations in Iraq reaches back to the early 1990's, well before the attacks on Espitia in mid-2003. (*Id.* at 14 )

After the United States invaded Afghanistan in 2001, Iran provided "safe haven" to several al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born

3

Sunni extremist who "initially operated under the protection of the IRGC and its elite Quds Brigade." (*Id.* at 10) "According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq." (*Id.*) In 2003, Zarqawi became a leader of Sunni extremists and insurgent groups in Iraq, which he consolidated with his pre-existing terrorist group—Jama'at al-Tawhid wal-Jihad (the Organization of Monotheism and Jihad). (Leo Bradley Report, Doc. 13-3, 9) In October 2004, he swore allegiance to Osama Bin-Laden and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as al Qaeda in Iraq (AQI). (*Id.*)

"[AQI] presented a very serious threat to the post-2003 stability of Iraq", and combatting AQI attacks was a focus for United States military in the early years of the Iraqi invasion. (Russell McIntyre Report, Doc. 13-7, 14) According to counter-terrorism expert Donald Barker, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." (Donald Barker Report, Doc. 13-4, 12; *see also* Kevin Lutz Report, Doc. 13-2, 5) These attacks were referred to as the "insurgency." (Donald Barker Report, Doc. 13-4, 13; *see also* Kevin Lutz Report, Doc. 13-2, 5) Sunni groups and AQI focused their activity in western and northern Iraq and Baghdad. (Michael Oates Report, Doc. 13-5, 10) The Sunni Triangle, where Espitia's missions occurred, lies to the Northwest of Baghdad.

In their attacks, insurgents typically used improvised explosive devices (IEDs) and explosively formed penetrators (EFPs). (*Id.* at 18–19) IEDs posed a growing threat to the United States military in Iraq, and in 2003, the military established an IED Task Force to counter the "rapidly expanding IED threat" in Iraq. (Kevin Lutz Report, Doc. 13-2, 4) Terrorist groups found the adaptable and inexpensive IEDs appealing. (Leo Bradley Report, Doc. 13-3, 6)

In contrast, an EFP represents a "compact but potent" type of weapon that is "much deadlier and more effective", and more difficult to produce, than an IED. (Compl., Doc. 1, 19) EFPs "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor." (Michael Pregent Report, Doc. 13-6, 16, n.31) The lethal threat posed by these

4

powerful roadside bombs prompted the U.S military to add additional armoring to its vehicles. (Kevin Lutz Report, Doc. 13-2, 14, 23)

In the early 2000's, "[c]opper EFPs require[d] a great deal of metallurgical and technical precision to manufacture, and thus [could] only be produced by specific machinery that was largely unavailable to terrorist groups operating in Iraq". (Kevin Lutz Report, Doc. 13-2, 14) Weapons specialists from the United States military have "traced much of the machinery used to manufacture the EFPS [ ] in Iraq to Iran and its illicit supply chain." (Michael Oates Report, Doc. 13-5, 26)  In fact, counter-terrorism and weapons experts consider EFPs to be "almost uniquely Iranian".  (Kevin Lutz Report, Doc. 13-2, 23)

Iran commonly provided IEDs and EFPs to terrorist cells in Iraq, both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the purpose of attacking United States servicemembers and further destabilizing the Iraqi region. (Leo Bradley Report, Doc. 13-3, 25; AEI Brief, Doc. 13-8, 22)  By the early 2000s, "a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 13-8, 22–23)  In 2007, evidence suggested that "EFPs were being used in terrain controlled by al Qaeda, not by Shiite militias."  (*Id.* at 23)

**C.  The Attack on Espitia**

Between May and June 2003, Anselmo Espitia encountered a series of EFP and IED attacks while on patrol as a combat engineer and 62B construction equipment repairer with the 3rd Squadron, 7th Calvary Regiment, 2nd Brigade Combat Team, Third Infantry Division in various locations in the Sunni Triangle of Iraq.  (Compl., Doc. 1, 3)  He was injured by multiple EFP and IED blasts that occurred both while he was patrolling in a military vehicle and on foot. (A. Espitia Decl., Doc. 12-9, 3)  Several of the attacks caused him to "black[ ] out for a couple minutes after the explosion," and resulted in a concussion.  (*Id.*)  He would also encounter ringing in his ears for days after the attacks.  (*Id.*)

5

Espitia continued to serve in Iraq until June 2003, when he was flown to a hospital in Germany for treatment. (A. Espitia Decl., Doc. 12-9, 3) He was discharged from the army shortly thereafter. (*Id.*) The EFP and IED attacks caused various injuries, including a traumatic brain injury, permanent memory loss, difficulty learning new tasks, speech impairments, personality and behavioral changes, loss of reasoning ability, loss of special perception, difficulty walking, dizziness, tinnitus, and post-traumatic stress disorder. (*Id.*; *see also* Compl., Doc. 1, 3)

Nearly nineteen years after the attack, Espitia continues to suffer from the injuries caused by the attack and struggles with post-traumatic stress disorder. (A. Espitia Decl., Doc. 12-9, 4)

**D. Procedural History**

Espitia brings this lawsuit along with several of his close relatives: M.E. and J.E., his minor and custodial children; Breanna Espitia, his adult daughter; and Ninfa Espitia, his mother. (Compl., Doc. 1) Espitia seeks compensatory damages for pain and suffering, economic and loss of income, and severe emotional distress and mental anguish, as well as punitive damages. (*Id.* at 24) Espitia's relatives each seek solatium damages and punitive damages. (*Id.* at 25–31)

Plaintiffs perfected service on Iran under 28 U.S.C. § 1608(a)(3). In November 2021, the Clerk of Court entered default. (Entry of Default, Doc. 9) Plaintiffs now move for default judgment. (Motion, Doc. 12)

**II. Analysis**

In general, a foreign state is immune from a lawsuit for money damages in a United States federal court. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 3d 40, 53 (D.D.C. 2006). The Foreign Sovereign Immunities Act, however, contains an exception for state-sponsored terrorism. This exception permits plaintiffs to sue a foreign state for damages caused by "an act of torture, extrajudicial killing . . . or the provision of material resources for such an act if such act or

6

provision of material or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A.

A prima facie case under the state-sponsored-terrorism exception to the FSIA requires the plaintiff to demonstrate that:

1) the foreign state defendant is designated as a state sponsor of terrorism when the original action was filed;

2) the claimant is a national of the United States;

3) the damages were caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for a terrorist attack;

4) the act(s) are engaged in by an official, employee, or agent of the foreign state;

5) while acting within the scope of the office, employment, or agency.

*Id.*

Material support or resources refers to "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification . . . weapons, lethal substances, [and] explosives". 18 U.S.C. § 2339A(b)(1); § 1605A(h)(3). "[W]here a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute." *Rimkus*, 750 F. Supp. 2d at 182 (cleaned up); *see Valore v. Islamic Republic or Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010) ("[T]here is no but for causation requirement for claims made under the FSIA.") (cleaned up). In other words, the plaintiff only needs to show that "a particular terrorist group committed the terrorist act", and that the foreign state generally sponsored that group such that the state "contributed to the group's ability to carry out the terrorist attack." *Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 153 (D.D.C. 2010).

**A. Liability**

Based on the applicable law and the evidence presented with the Motion, the Court concludes that Plaintiffs have provided satisfactory evidence to establish a prima facie case under Section 1605A to support a default judgment.

The evidence easily satisfies the initial two elements. First, since 1984, the United States has designated Iran as a state sponsor of terrorism. Second, all claimants enjoy United States citizenship. Plaintiffs' Motion turns then, on whether they have established the remaining three elements–i.e., does the evidence demonstrate a clear causal connection between Iran's state action and the terrorist attacks that injured Espitia? The Court finds that Plaintiffs have demonstrated such causation.

The series of attacks on Espitia involved several EFPs, which counter-terrorism and weapons experts considered at the time to be "almost uniquely Iranian". In 2003, the technology required to create EFPs surpassed the skills and equipment of terrorist groups operating in Iraq. As a result, those groups, including AQI, sourced such weapons from more-sophisticated suppliers. (Michael Pregent Report, Doc. 13-6, 16) Iran willingly filled that role, commonly providing IEDs and EFPs to terrorist cells in Iraq, both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the purpose of attacking United States servicemembers and further destabilizing the Iraqi region. (Leo Bradley Report, Doc. 13-3, 25; AEI Brief, Doc. 13-8, 22) By the early 2000s, "a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 13-8, 22–23)

The evidence also demonstrates that Iran provided material support specifically to AQI. The United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a "safe haven", as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq. (United Against Nuclear Iran Brief, Doc. 12-5; AEI Brief, Doc. 13-8, 13–

8

36) Several years after the EFP and IED attacks injured Espitia, intelligence experts determined that Iran was responsible for a significant portion of AQI's weapons arsenal, and would have been AQI's principal supplier of EFPs.  (AEI Brief, Doc. 13-8, 23)

Armed by Iran, AQI consistently carried out attacks against United States servicemembers in Iraq.  (Michael Oates Report, Doc. 13-5, 10)  It is true that no terrorist group claimed responsibility for the series of attacks at issue, and no investigation found definitive, direct evidence of AQI's involvement.  The use of multiple IEDs and EFPs in a series of attacks, however, renders almost a certainty that Iran supplied at least some of these weapons, and the evidentiary record establishes that AQI regularly conducted terrorist attacks in the area with IEDs and EFPs that Iran supplied directly or helped fund.  As a result, the Court concludes that the evidence is satisfactory to demonstrate that Iran, through various state officials and agents, contributed significantly to AQI's ability to orchestrate multiple attacks throughout the Sunni Triangle in this brief period of time.

**B.  Damages**

Espitia seeks compensatory damages for pain and suffering, economic loss and loss of income, and severe emotional distress and mental anguish, as well as punitive damages to punish the defendant for their support of terrorism in Iraq.  (Compl., Doc. 1, 24)  Espitia's family members each seek solatium damages and punitive damages.  (*Id.* at 24–31)

Section 1605A(c) provides that victims of state-sponsored terrorism may recover money damages, including "economic damages, solatium, pain and suffering, and punitive damages." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017).  "To obtain compensatory damages in an FSIA case, a plaintiff 'must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate.'" *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012)).

Applying this analysis to the present case, the Court initially finds, for the reasons previously articulated in Part II.A, that Plaintiffs have satisfactorily shown that Iran's material support of AQI had the reasonably certain and intended consequence of causing the attacks and the resulting damages to him and his family members. To determine a reasonable estimate of the resulting harm to each plaintiff, the Court relies on Espitia's declaration and prior awards for comparable injuries in other FSIA cases.

### 1. Anselmo Espitia's Damages

Anselmo Espitia states that "[t]he Terrorist Attack caused [him] severe injury, including: pain and suffering (past, present, and future); economic damages (past, present and future) and loss of income (past, present, and future); and severe emotional distress and mental anguish." (Compl., Doc. 1, 24)  He requests compensatory damages of $5 million.  (Motion, Doc. 12, 33)[3]

### a. Pain and Suffering

Courts consider several factors when assessing a reasonable estimate of compensatory damages for the pain and suffering of terrorist-attack survivors. Those factors include "the severity of pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (internal quotations omitted).  Under the FSIA, courts have applied a "baseline assumption [ ] that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012).  In *Davis*, the court reduced the baseline amount by over 50% because the terrorist-attack survivors suffered minor physical injuries, such as hearing loss and severe post-traumatic stress disorder.  *Id.* at 13.  In contrast, in *Valore*, the court increased the amount to $7.5 million where the victim suffered from burns covering 90% of his body and other "particularly horrendous physical injuries."  700 F. Supp. 2d at 84.

---

[3] In his Complaint, Espitia requests at least $10 million in compensatory damages. (Doc. 1, 31)  In his Motion for Default Judgment, he reduces the request to $5 million. (Doc. 12, 33)

In the present case, the Court finds that the evidentiary record supports the baseline award of $5 million. Espitia endured multiple EFP and IED attacks while on patrol as a combat engineer and 62B construction equipment repairer for the United States Army. (Compl., Doc. 1, 3; A. Espitia Decl., Doc. 12-9, 3) Several of the attacks caused him to "black[ ] out for a couple minutes after the explosion," and resulted in a concussion. (A. Espitia Decl., Doc. 12-9, 3) He would also encounter ringing in his ears and dizziness for days after the attacks. (*Id.*)

Nineteen years after the attack, Espitia continues to suffer. He describes issues with mood swings, post-traumatic stress disorder, headaches, dizziness, and tinnitus. (A. Espitia Decl., Doc. 12-9, 2) And as a result of the lingering effects of the attack, he struggles to stay employed, possesses a diminished short-term memory, experiences depression, and nightmares. (*Id.*) He also states that to address his issues with sleeping, he has turned to alcohol, which has interfered with his personal and family life. (*Id.*)

Based on these injuries, both physical and otherwise, that the terrorist attack caused Espitia, the Court awards him $5 million in compensatory damages.

### b. Economic Loss

Espitia also requests economic and loss of income damages. Plaintiffs seeking such damages must "support the claim [ ] with competent evidence" demonstrating that the incident in question proximately caused the economic loss. *Moradi*, 77 F. Supp. 3d at 71; *see also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 31 (D.D.C. 2011). "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." *Oveissi*, 768 F. Supp. 2d at 31; *see also Braun*, 228 F. Supp. 3d at 83 (declining to award economic damages to plaintiffs who submitted insufficient evidence).

In support of his claim for economic loss, Espitia affies that he has struggled to keep a job and gets confused easily. (A. Espitia Decl., Doc. 12-9, 4) But he presents no information regarding his salary at the time of the accident, or his present-day earning capacity, depriving the Court of

any basis on which to calculate the loss of earning capacity resulting from his injuries. Accordingly, the Court has an insufficient basis on which to calculate the economic loss attributable to the defendant's conduct.

Due to the absence of satisfactory evidence, the Court awards no economic loss damages.

### 2. Family Members' Damages

Four of Espitia's relatives—M.E. and J.E., his minor and custodial children; Breanna Espitia, his adult daughter; and Ninfa Espitia, his mother–seek solatium damages to compensate for the loss of guidance, companionship, consortium, and severe emotional distress they experienced as a result of the terrorist attack. (Compl., Doc. 1, 24–31)

"A claim for solatium seeks compensation for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society, and comfort." *Braun*, 228 F. Supp. 3d at 84 (citations omitted); *see* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining solatium damages as those that compensate for "hurt feelings or grief, as distinguished from damages for physical injury"). Family members of individuals who survive a terrorist attack may also recover such damages. *See, e.g., Valore*, 700 F. Supp. 2d at 85. As solatium damages are "by their very nature unquantifiable," courts have relied on the framework set forth in *Estate of Heiser v. Islamic Republic of Iran* as a standardized approach when awarding solatium damages in FSIA cases. 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *see, e.g., Braun*, 228 F. Supp. 3d at 85; *Moradi*, 77 F. Supp. 3d at 72; *Roth*, 78 F. Supp. 3d at 403 (applying the *Heiser* damages framework for solatium damages in FSIA cases).[4] Under the *Heiser* framework, "[r]elatives of surviving servicemen receive[ ] awards valued at half of the awards to family members of the deceased: $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings." *Valore*, 700 F. Supp. 2d at 85.

---

[4] Courts have also found that FSIA solatium claims are "indistinguishable from the [tort of] intentional infliction of emotional distress". *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001); *see Roth*, 78 F. Supp. 3d at 403 ("Solatium under the FSIA is functionally identical to IIED.").

Courts increase the baseline solatium damages based on evidence of a particularly-close relationship between the claimant and the victim, medical proof of severe grief, or circumstances surrounding the attack that may have increased the plaintiff's suffering. *Braun*, 228 F. Supp. 3d at 85 (finding that the parents' presence at the scene of the attack supported a finding of "heightened anguish" and a 25% enhancement of the *Heiser* baseline); *see also Oveissi*, 768 F. Supp. 2d at 27–29 (applying a 50% enhancement of the *Heiser* baseline based on the close familial relationship between the plaintiff-grandchild and the deceased grandparent, and evidence of the disturbing nature of the killing that demonstrated a heightened level of suffering). On the other hand, courts depart downward from the baseline amount when no evidence demonstrates a close relationship between the claimant-relative and the victim. *See Valore*, 700 F. Supp. 2d at 87 (departing downward by 50% where the relationship between the victim and his brother was "fairly attenuated").

### a. Ninfa Espitia, Mother of Anselmo Espitia

Ninfa Espitia requests compensatory damages of $1 million as Anselmo Espitia's mother. (Compl., Doc. 1, 29, 32)[5] With her request, however, Ninfa Espitia submits no evidence regarding her relationship with her son or the nature of the suffering that the attack caused. And Anselmo Espitia's declaration contains no information related to his mother.

The Court recognizes that parents typically qualify for solatium damages, given the inherently-close relationship between parent and child. In the decisions awarding such damages, however, the plaintiff-parent presented some evidence of the nature of the relationship and the type of harm suffered. *See, e.g., Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 7, 84–85 (D.D.C. 2017) ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack *as long as* there is some evidence of that they suffered mental

---

[5] In the Complaint, Ninfa Espitia requests at least $3 million in compensatory damages, but reduces that amount to $1 million in the Motion. (Doc. 12, 33)

anguish and trauma as a result of it." (emphasis added)). In the absence of such evidence, courts have denied solatium damages. *See, e.g., Roth*, 78 F. Supp. 3d at 405–06 (denying solatium damages to a sibling "where no evidence is offered to show injury that an award of solatium damages might compensate").

In the present matter, no evidence describes the harm that the terrorist attack inflicted on Ninfa Espitia, as Anselmo Espitia's mother. As a result, the Court has no basis on which to award solatium damages.

### b. M.E. and J.E., Minor and Custodial Children of Anselmo Espitia

Espitia's minor children M.E. and J.E. each request $1.5 million in compensatory damages. (Compl., Doc. 1, 26, 31)[6] Similar to Ninfa Espitia, however, M.E. and J.E. submit no evidence describing their relationship with their father or the nature of their alleged damages. At most, Espitia mentions in his declaration that the stress he endures as a lingering result of the attacks causes him to drink alcohol in excess, which has caused problems in his family life. (A. Espitia Decl., Doc. 12-9, 2) But this evidence does not describe any specific impact on his children. As a result, the Court has no basis on which to award solatium damages to M.E. or J.E.

### 3. Punitive Damages

"Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C.2012). In FSIA cases, courts typically have determined whether punitive damages are appropriate based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008). Where the plaintiff has established that a foreign state has provided material support to a

---

[6] In the Complaint, M.E. and J.E. request at least $3 million in compensatory damages, but reduce the amount to $1.5 million in the Motion for Default Judgment. (Doc. 12, 33–34)

14

terrorist organization, these four factors strongly favor awarding punitive damages. *See, e.g., Braun*, 228 F. Supp. 3d at 86. For example, in *Oveissi,* the court awarded punitive damages based on its finding that Iran provided funding and resources to Hezbollah and MOIS to carry out a "horrific assassination". 879 F. Supp 2d at 55. As to the first and second factors, the court emphasized that "[t]he nature of the defendants' act and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom." *Id.* at 56. Regarding the third and fourth factors, the court found that "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism," supporting the award of $300 million in punitive damages to dissuade Iran from further sponsorship of terrorists. *Id.* at 57.

Courts have taken at least three distinct approaches to determine the amount of a punitive-damages award under the FSIA. First, several courts have estimated a foreign state's "annual expenditure on terrorism" and multiplied that figure by a factor between three and five. *See Acosta*, 57 F. Supp. 2d at 31 (estimating Iran's annual expenditure on terrorism at between $50 and $150 million, and awarding $300 million in punitive damages); *Roth*, 78 F. Supp. 3d at 406 (applying a multiplier of three to an estimated annual expenditure of $37.5 million to award $112.5 million in punitive damages). At the same time, under this approach, some courts have declined to multiply the estimated annual expenditures when the resulting amount would have exceeded $300 million. *See Oveissi*, 879 F. Supp. 2d at 56–57 (reasoning that a $300 million punitive-damages award was consistent with similar FSIA cases); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011) ("[W]ith one exception, [this court has] never awarded an amount higher than $300 million in punitive damages against Iran.").

Other courts have awarded "punitive damages in an amount equal to the total compensatory damages awarded". *Moradi*, 77 F. Supp. 3d at 73 (awarding $10.168 million in compensatory damages, and the same amount as punitive damages); *see also Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014) (subsequent history omitted)

15

(apportioning punitive damages among the plaintiffs according to their compensatory damages). The *Moradi* court distinguished the cases that applied a multiplier calculation by explaining that the case before it concerned actions taken directly by Iranian authorities, and noted that the victim had survived the attack. 77 F. Supp. 3d at 73.

Finally, other courts have awarded a fixed amount of $150 million in punitive damages per affected family. *See Braun*, 228 F. Supp. 3d at 87 (concerning Iran's material support of Hamas, which in turn orchestrated a terrorist attack in Jerusalem by driving a car into a crowd of pedestrians); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (involving Syria's material support of AQI, which released a graphic video of the gruesome decapitation of two American citizens).

In the present matter, the Court finds that punitive damages should be awarded to further the goal of punishing Iran for its reprehensible support of AQI, and to deter it and other foreign sovereigns from supporting terrorist organizations in the future. The evidentiary record demonstrates that Iran's support of AQI foreseeably led to indiscriminate acts of violence and murder in Iraq, including the attacks that injured Anselmo Espitia. Iran poured extensive resources into manufacturing the EFP—a weapon that was specifically designed to penetrate the U.S. military's armored vehicles—and utilizing its smuggling networks to deliver this type of weapon to terrorist organizations that were best positioned to launch an attack. Iran's support enabled AQI to plan such an attack, and provided the equipment and other resources necessary for AQI to implement the assault. The Court finds that an award of punitive damages is appropriate and necessary to punish Iran for its conduct and to deter it from similar future behavior.

Turning to the appropriate amount of punitive damages, the Court first notes that the evidentiary record contains no data regarding Iran's annual expenditures in support of terrorism, or of its wealth. Decisions from other cases involving Iran provide a range of punitive damages previously imposed against that country, but those cases generally involved more robust

evidentiary records. The Court recognizes that punitive damages, meant to punish and deter the defendant, should typically turn in large part on the particular defendant's wealth, so as to provide a meaningful deterrent. But in the current matter, such a measure proves difficult, if not impossible. As a result, the Court will base the award of punitive damages on its award of compensatory damages, but with a five-fold multiplier to increase the deterrent impact. Based on this approach, the Court awards $25 million in punitive damages to Espitia.[7] The remaining plaintiffs are not entitled to recover a share of the punitive damages award.

### III.  Conclusion

For the reasons previously explained, it is:

**ORDERED** that Plaintiffs' Motion for Default Judgment (Doc. 12) is **GRANTED IN PART AND DENIED IN PART** as explained in this Order and Opinion; and

**ORDERED** that by no later than July 22, 2022, Plaintiffs submit a motion for attorney's fees, identifying the statutory or other basis for the recovery of such fees, as well as any necessary evidence to support the requested amount of attorney's fees, and for the award of pre- and post-judgment interest.

Upon the filing of the motion related to attorney's fees and pre- and post-judgment interest, the Court will issue a Final Default Judgment in accordance with this Order and Opinion.

It is also **ORDERED** that Plaintiffs serve a copy of this Order and Opinion on Defendant Islamic Republic of Iran consistent with the requirements of 28 U.S.C. § 1608(e).

Signed on June 16, 2022.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge

---

[7] This award is also consistent with the Supreme Court's guidance that when reviewing a punitive damages award, due process warrants the consideration of, among various factors, the disparity between the compensatory and punitive damage awards. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).